MOORE v. DuBARD.

1. APPEAL AND ERROR—PARTNERSHIP—BURDEN OF PROOF—DE NOVO REVIEW.

In order to determine whether or not plaintiff in suit for dissolution of alleged partnership sustained his burden of proving the partnership the entire record is reviewed, as the Supreme Court reviews the matter *de novo.*

2. PARTNERSHIP—MASTER AND SERVANT.

No general rule may be laid down which will afford an automatic solution of the question of whether a certain relation is that of partnership or one of employment.

3. SAME—EVIDENCE.

The legal effect of the arrangement between parties in suit wherein one of them seeks to establish relation of partnership is determined by the circumstances of their association during the period of its existence.

4. SAME—EVIDENCE—ADMISSION AGAINST INTEREST.

In suit by one claiming to be defendant's partner, exhibits consisting of copy of income tax return which showed plaintiff reported his income as wages, salary or commissions was admissible as an admission against interest.

5. SAME—EVIDENCE—ESTOPPEL.

In suit between two manufacturer's representatives and sales agents whereby plaintiff sought to establish relation of partnership, evidence failed to establish there was either a partnership agreement or a partnership by estoppel (2 Comp. Laws 1929, § 9856).

6. SAME—DEATH OF PARTNER—POSSESSION OF FIRM'S PERSONALTY.

If a legal partnership exists between two parties, the personal assets of the partnership do not pass to the legal representative of a partner who dies but go to the surviving partner who has the sole right to their possession to wind up the affairs of the partnership and then pay over the net results to the legal representative of the deceased's estate.

7. SAME—MEETING OF MINDS.

There must be a meeting of the minds between two or more persons before a partnership, except by estoppel, can exist.

8. SAME—BURDEN OF PROOF.

Plaintiff, claiming a partnership relation existed between himself and defendant, has the burden of proving such relation existed by preponderating evidence.

9. SAME—GIST OF RELATIONSHIP—MUTUAL AGENCY—JOINT LIABILITY.

The gist of the partnership relation is mutual agency and joint liability.

10. SAME—CO-OWNERSHIP—SHARING OF GROSS RETURNS.

Even if co-ownership of a business or that the parties shared gross returns of the business of an alleged partnership be proved, it would not necessarily establish a partnership (2 Comp. Laws 1929, § 9847).

11. SAME—COMMISSIONS AS SHARE OF PROFITS—PRIMA FACIE EVIDENCE—WAGES—INFERENCES.

The receipt of commissions by plaintiff as a share of the profits of the business of an alleged partnership constitutes no more than prima facie evidence of a partnership, but no such inference obtains if received as wages (2 Comp. Laws 1929, § 9847).

12. SAME—JOINT ADVENTURES.

Where plaintiff claims a partnership relation with defendant in business of representing various manufacturers as their sales agent, and disclaims a joint venture, the probability of the existence of a joint venture between the parties as to the various manufacturer's sales accounts does not necessarily constitute a partnership.

13. JOINT ADVENTURES—PARTNERSHIP.

Parties interested in a joint venture are not partners unless one of them has clothed the other with an agency to act on his behalf in the business.

14. PARTNERSHIP—BURDEN OF PROOF—EVIDENCE.

In suit to establish a partnership relation with defendant in business as a sales representative and agent for various manufacturers, plaintiff *held*, to have failed to sustain burden of proof where there does not appear to have been a partnership agreement, no co-ownership of tangible or intangible property, no agreement to share losses, no partnership income tax report ever made, no partnership books or bank account, no mutual agency or joint liability, no certificate of partnership

ever filed and business was taxed and carried on solely under defendant's name (2 Comp. Laws 1929, § 9846, as amended by Act No. 272, Pub. Acts 1941; §§ 9847, 9856; § 9929 *et seq.,* as amended by Act No. 273, Pub. Acts 1931).

Appeal from Wayne; Murphy (George B.), J. Submitted June 3, 1947. (Docket No. 11, Calendar No. 43,516.) Decided October 13, 1947.

Bill by Walter E. Moore against Walter E. Du-Bard to dissolve a partnership, for appointment of a receiver, and for an accounting. Decree for plaintiff finding a partnership, appointing a receiver and referring to circuit court commissioner for accounting. Defendant appeals. Reversed.

*Howard Farrell* and *Cyril C. Pulford,* for plaintiff.

*Vandeveer & Haggerty,* for defendant.

BOYLES, J. Plaintiff filed a bill of complaint in the circuit court for Wayne county in chancery alleging that prior to 1931 he had been engaged in business as a sales representative and manufacturer's agent in the sale of various merchandise and products for manufacturers, and that the defendant has also been engaged in a like occupation; that in 1931 they entered into an agreement to become partners in such business; that they carried on such business connection until April 15, 1944, at which time the defendant informed the plaintiff that he intended to terminate their business relationship, and did so. Thereupon plaintiff filed the instant bill of complaint praying for a dissolution of the alleged partnership, the appointment of a receiver, and an accounting. The defendant denied the existence of a partnership, claimed that plaintiff was in his em-

ploy on a commission basis, and that he had terminated such employment on April 15, 1944, because of plaintiff's immoderate use of alcoholic beverages and neglect of business.

During an extended hearing in circuit court the parties agreed that before any proofs were taken with reference to an accounting, the proofs should be limited to the principal issue whether the arrangement between the parties constituted a partnership. At the conclusion of much testimony, the trial court entered a decree to the effect that plaintiff and defendant were partners, appointed a receiver, and ordered a reference to a circuit court commissioner for an accounting. The defendant was directed to turn over to the receiver all assets, books and records, and the conduct of the business until further order of the court. The decree was stayed on the filing of an appeal bond and the defendant appeals.

The sole question here for decision is whether plaintiff has sustained the burden of proving the existence of a copartnership. Plaintiff disclaims that their arrangement was a joint venture, nor does plaintiff claim that he is entitled to specific performance of any alleged agreement to pay him commissions on business procured. The voluminous record must be reviewed to determine whether plaintiff has met his burden of proof, and we review the matter *de novo*. It becomes necessary to examine all of the facts and circumstances of the association between the parties. Courts have not been able to lay down any general rule which will afford an automatic solution of the question of a partnership as distinguished from an employment. For various situations considered and cases discussed, see a lengthy annotation to *Sheldon* v. *Little,* 111 Vt. 301 (15 Atl. [2d] 574), found in 137 A. L. R. 6–174.

In 1928 the defendant had been engaged in the sale, to various factories in Detroit and vicinity, of leather belting on commission. His supplier was the I. B. Williams company. In 1928 plaintiff had a desk in the defendant's office in Detroit and began, also, to sell the I. B. Williams product on commissions. It is not claimed that they were partners at that time. Plaintiff was to retain all the commissions that he earned, up to $200. Plaintiff testified that he had several conversations with defendant in 1931, regarding the obtention of the Manhattan Rubber Manufacturing Division account, a subsidiary of the Raybestos-Manhattan, Inc., selling rubber belting. He claims that a partnership agreement was entered into at that time, and testified to the inception of such an agreement as follows:

"*Q.* Did you have any other conversation with Mr. DuBard about the same matter, about getting a further or other account? (The Manhattan account)

"*A.* Yes, sir.

"*Q.* And where did you have that conversation and when, to the best of your recollection?

"*A.* Well, it happened a number of times in the office.

"*Q.* Well, when was one of the times, or the last time, you had a conversation in the office?

"*A.* Oh, I would say some time in November.

"*Q.* Of 1931?

"*A.* Yes, sir.

"*Q.* And did you and Mr. DuBard sit down and have a talk about the Manhattan Rubber Company account?

"*A.* At that time, you mean?

"*Q.* Yes.

"*A.* I think so. I am sure of it, in fact.

"*Q.* You are sure of it. And did you talk about the possibility of getting any other account?

"*A.* Yes.

"*Q.* All right. Now, this is after you had been sharing the office for a couple of years, is that right?

"*A.* Why, it would be about that time, yes.

"*Q.* Now, then, in your conversation with Mr. DuBard, in regard to obtaining the account of the Manhattan Rubber Company, or any other account, what did you say to him, and what did he say to you in regard to those accounts, if you got them?

"*A.* Well, he said if we can—

"*Q.* Who said that now?

"*A.* Mr. DuBard.

"*Q.* All right.

"*A.* I said, 'If we can get two or three accounts, why we will be pretty well set when this thing picks up.' He said, 'That's right. You and I will go together on them.'

"*Q.* On such accounts—

"*A.* As we could get.     *     *     *

"*Q.* What did he say?

"*A.* He said, 'That's OK with me.'

"*Q.* What was OK with him?

"*A.* To go in on these accounts.

"*Q.* Where?

"*A.* I don't understand that question.

"*Q.* You said it was OK with him to go in on these accounts?

"*A.* Yes, sir, any we could get.

"*Q.* What did he say he would go into? What did he say you two men would do in regard to handling these accounts if you got them?

"*A.* My way to put it, he said we are going in as partners."

The defendant denies that anything was said leading the plaintiff to infer they were forming a partnership. That there was no such understanding, the defendant testified to a conversation the parties had in 1933 or 1934, as follows:

"During the years 1932 and 1933, when in addition to the I. B. Williams & Sons monthly state-

ment, the Manhattan statements started to come in, Mr. Moore and I made monthly computations. Some months he made them; some months I did. After it was ascertained as to how much Mr. Moore had coming, I paid him. The checks from the Manhattan Rubber Company, from their inception, that accompanied their monthly statement, were made payable to W. E. DuBard. The statements themselves, as prepared, from those that are in evidence, those were made out in the name of W. E. DuBard. From the inception of Mr. Moore's association with me in the year 1928, in the month of October, through the year 1933, he paid no sum of money whatever towards office expenses. The reasons back in 1928 I kept Mr. Moore associated with me were for several reasons. I liked him very well and another reason is I thought he had great possibilities, or, at least, good possibilities, and he apparently put forth a lot of effort. He seemed to have a lot of courage. I don't know as I could enumerate any more than that.

"Either in December, 1933 or January, 1934, I had a conversation with Mr. Moore in reference to expenses. The conversation took place in my office. Mr. Collyer (the bookkeeper) was in the office at that time. As I remember the conversation, Mr. Moore said, 'I have been working out of this place about five years, and you have been giving me a fine break. I think I ought to stand some of these expenses.' He also stated, 'You have been taking a licking and loss during the last few years business has been bad.' "

Mr. Collyer, defendant's bookkeeper, testified:

"I recall a conversation in the latter part of 1933 between Mr. DuBard and Mr. Moore, wherein I was present, at the office of W. E. DuBard in reference to the matter of expenses.

"*Q.* Now, Mr. Collyer, do you recall what was said by Mr. Moore in reference to this subject

matter of expenses, and what was said by Mr. Du-Bard at that time and place?

"*The Court:* Where was the place?

"*Q.* Where was the place of the conversation?

"*A.* That was on Loraine.

"*The Court:* The business place?

"*A.* Yes, sir. Well, as near as I can recall the conversation, Mr. Moore said, 'I have been making my living off these accounts for approximately the last five years and I feel that I should stand some portion of the overhead besides just the delivery expense.'

"*Q.* What was said in reply to that and who spoke?

"*A.* And Mr. DuBard said that he had been standing the expense and he saw no reason why he shouldn't stand them, and Mr. Moore said, 'Well, I want to stand some portion of the expense,' and Mr. DuBard said 'Well, if that's the case, I will give you the 60 per cent. on Manhattan.'

"*Q.* Was anything said about the expenses?

"*A.* And 40 per cent.—

"*Q.* Well, what did DuBard say, what was his language about the expenses?

"*A.* Well, he said, 'If you want to stand 40 per cent. of the expense, why I will give you 60 per cent. on the Manhattan account.'

"*Q.* What did Mr. Moore reply to that?

"*A.* He said that would be all right."

Thereupon it was agreed that plaintiff should have 60 per cent. of the Manhattan commissions and would stand 40 per cent. of the office expenses. This arrangement lasted until 1941, and in the meanwhile other products were added by contracts between the defendant and Pyott Foundry & Machine Company (pulleys), Globe Woven Belting Company, Browning Manufacturing Company, and several others. All manufacturers' contracts were signed by defendant and in his name alone. The commis-

sions on most of these were split 50–50 and the expenses were not allocated to them, but were shared as a whole on the 40–60 basis. Some accounts were handled by each individually and the commissions on them were not split. This was true of the I. B. Williams company, Universal Paper Bag, Excelsior, Lewellen, and Manhattan bowling balls. Each paid his own automobile, traveling, and entertainment expenses. On the Williams account their usual practice was for each to retain the commissions earned by his own efforts. Plaintiff admitted there was no pooling of these commissions. Regarding another account (Excelsior), plaintiff admitted:

"We both engaged in sales of that company. What he sold he got on that, and what I sold, I got on that. So far as that account was concerned, that was handled similar to the I. B. Williams account. It was not included in the agreement in regard to these other accounts that I mentioned."

At the time plaintiff claims that a partnership agreement was entered into they were also selling rubber belting for Gates Rubber Company. In 1931 a former representative for Gates recommended DuBard as a Manhattan representative, and a contract was signed by the defendant. In fact, all such contracts were taken in the name of the defendant alone. Plaintiff first testified that they had been splitting the Gates commissions and expenses, but corrected this later to apply only to the commissions. Defendant testified that they received separate commissions, and this was confirmed by the former Gates representative. The manager of the Manhattan Rubber Division testified that the negotiations were with defendant alone. Defendant claims there was no conversation about the manner of handling the account until after the contract with the manufacturer was signed, at which time plaintiff suggested that as he would be doing most of the

selling he should receive 60 per cent. of the commissions. Defendant did not agree to this, and pointed out that he was paying all of the expenses. They then agreed to split the commissions 50–50.

Sometime during their association plaintiff became sales representative for the Universal Paper Bag Company. He kept all of the commissions—defendant got no part of them. His commissions on this account exceeded $2,000 during each of the years 1937 and 1938. On the other hand, the defendant acquired the Lewellen account, and retained all of the commissions. Plaintiff had no part in it. The defendant also had the business of selling bowling balls for a division of one of the rubber companies. Plaintiff did not get a commission on this business, paid no part of the expenses, but received some of the profits until 1941, at which time the defendant cut plaintiff off from any further participation in the profits. Their understanding varied widely as between their many accounts. In some, plaintiff received all of the commissions on his own sales. In others, he received nothing. It is a fair conclusion that the split in profits was dictated by the defendant, although apparently the parties reached a satisfactory agreement in each instance. The fact that plaintiff paid no losses from 1932 is admitted by him. The plaintiff admitted:

"Through this period of time, from 1932 to 1942, there was no month during that period of time wherein I sustained a business loss, where I had to go down in my pocket and pay some money. I made a profit each and every month."

As to the method of receiving payment for commissions, plaintiff testified:

"DuBard always had a checking account from the time I went there, July, 1928, to April 15, 1944. Consistently, in that period, I received checks

signed by W. E. DuBard, and in a few instances, Murray Collyer, drawn on that checking account for my commissions or for my salary—whatever you want to term it—for my part of it. There never was a checking account in the name of Walter Du-Bard and Walter Moore. I take care of my own money.''

In 1941 plaintiff was ill for some time. Defendant claimed that he was drinking too much and not paying attention to business, and a new arrangement was made whereby plaintiff received only 50 per cent. of the commissions. Beginning late in 1941 the defendant took two-thirds of the commissions on sales of Hettrick products to the Budd company. In 1942 defendant took 35 per cent. of the commissions on plaintiff's sales for I. B. Williams.

Ultimately the plaintiff apparently became dissatisfied with their arrangement, complained of the treatment he was getting to Mr. Murray, a salesman, and to Miss Keeney, the stenographer, and urged them to look for other jobs. On April 15, 1944, defendant informed the plaintiff that he was discharged. Defendant told plaintiff he would pay him commissions for the balance of the year on sales to certain customers which plaintiff had procured, and they drew up a list of such customers. A few weeks later plaintiff filed the instant bill of complaint, claiming a partnership.

The legal effect of the loose arrangement between these parties must be determined by the circumstances of their 15 years of association. Some of the indicia of a partnership are present, many others are lacking. In favor of a partnership, no social security payments were made on plaintiff's employment by the defendant, nor was any of plaintiff's income tax withheld by the defendant. However, defendant sent a statement of plaintiff's

withholding taxes (none) to the internal revenue service. All goods were consigned to defendant alone, they were stored in buildings leased by him or in a building held in his wife's name, and when insurance was not paid by the manufacturer, defendant paid it, as well as the personal property tax. In figuring up the split of commissions, either plaintiff or defendant computed the commissions, usually on the back of invoices. Apparently little, if any, books or memoranda of accounts were kept as to their transactions with each other. The defendant did the financing. Funds were banked in his account which was held jointly with his wife and though the bookkeeper had power to write checks on it, plaintiff did not have. There were occasions when plaintiff attempted to refer to the defendant as his partner. The promptness with which the defendant denied a partnership existence leads to a fair inference that there was no such mutual agreement as is necessary to a consummation of a partnership agreement. A witness testified:

"Q. I asked you, witness, did you ever hear Mr. Moore say 'Me and my partner'?

"A. Oh, yes, I did.

"Q. Now, how many times have you heard him say that, your best recollection?

"A. My best recollection would be 4 or 5 times.

"Q. During what period of time, now, starting what year and ending what year?

"A. From about 1938, shortly after we moved into the new building on Milwaukee, through 1943.

"Q. Through 1943. Now, when he used this phrase, 'Me and my partner,' was Mr. DuBard present?

"A. Yes, he was.

"Q. On these occasions?

"A. Yes, sir.

"*Q.* And what reply did Mr. DuBard make to him?

"*A.* Well, Mr. DuBard said, 'What do you mean, "Me and my partner."' He said, 'You know, I won't have anyone else in my business. I wouldn't even have any of my own relations.'

"*Q.* Did this conversation happen only once, in substance as you testified, or did it happen, as you have said, 4 or 5 times?

"*A.* 4 or 5 times.

"*Q.* And the last time you fix in 1943?

"*A.* Yes.

"*Q.* And the first time was in 1938?

"*A.* Yes, sir."

A salesman, Mr. Murray, was hired in 1940. He paid no expenses, and the parties to this action split his commissions between them. But in 1942 when the new arrangement was made plaintiff ceased to share in these commissions, and Murray received a portion of them from the defendant from then on. The question of sharing losses does not seem to have come up, because, as plaintiff remarked, they did not anticipate any losses.

Most of the advertising material carried defendant's name only, although there had been some with pictures of both men and the motto "The two Walts to serve you." The sign in front of their establishment bore defendant's name alone.

On his personal income tax returns plaintiff reported his income under item 1 (salaries, wages, commissions, fees, et cetera), not "net profit from business," or "income from partnerships." Attached to plaintiff's 1941 income tax report is a schedule showing $18,909.16 as "wages from W. E. DuBard." Plaintiff admitted that these exhibits were copies of his income tax reports. The circuit judge excluded these exhibits on the ground of privilege, that they were irrelevant and immaterial.

Plaintiff's report of income as wages, salary or commissions paid by the defendant is an admission against interest, and is inconsistent with his present claim of a partnership where such income would properly have been reported as profits. We find no sound reason why a court in chancery should refuse to take these exhibits into consideration. While the defendant deducted no social security tax on commissions paid to plaintiff, neither did he do this on commissions paid to other commission salesmen employed by him, but only on salaried employees. The same applies to withholding tax after this was made effective. However, defendant reported to the internal revenue service as to salaries and wages paid to plaintiff for the year 1942, and of "wages" paid by defendant to plaintiff for the year 1943.

Defendant testified that when plaintiff wanted to bring his son into the business he told plaintiff emphatically that they were not partners. This was in 1934 and 1938. Plaintiff was not questioned on this.

Mr. Bass, manager of I. B. Williams, testified as to an admission by plaintiff in 1943 that he had no interest in the business.

Mr. Murray, a commission salesman for the defendant, testified that when he was hired he had asked who he was working for, as plaintiff seemed to assume a lot of authority, that defendant said he was working for him and that plaintiff was a salesman. Murray testified that on April 15, 1944, during the dispute that followed defendant's firing of plaintiff, the latter admitted that he was not a partner.

Summarizing the business connection between these parties, the following circumstances, among others, point to the conclusion that there was no partnership agreement:

There was no written agreement during the 15 years of their connection. The business was always

carried on under the sole name of ''W. E. DuBard,'' without exception;

All manufacturers' agency or sales contracts covering the accounts were solely in defendant's name. There was no co-ownership of property;

There was no general agreement to share losses, if any; and the split of profits (commissions) varied with the accounts;

No partnership income tax report was ever made, each making his own individual returns;

There was never a partnership bank account; no partnership books were kept;

All commission checks from manufacturers were sent to defendant and were payable to him, and he deposited these in his joint bank account and paid plaintiff by check therefrom;

Personal property such as office furniture and merchandise, except plaintiff's desk and chair, was defendant's property. The personal property was assessed and taxed in defendant's name alone;

There was no mutual agency and joint liability.

One of the most important indicia of a partnership is lacking. No certificate of partnership was ever filed, to comply with the statutory requirement.[*]

We note, also, that many legal consequences of a partnership do not seem to have been in the contemplation of these parties during their 15 years of business dealings. There is no proof that either of them represented to those with whom dealings were had that they were partners, thus opening the way to a partnership by estoppel. 2 Comp. Laws 1929, § 9856 (Stat. Ann. § 20.16). Manufacturers' contracts were taken by the defendant, and in his

---

[*] See 2 Comp. Laws 1929, § 9929 *et seq.*, as amended by Act No. 273, Pub. Acts 1931 (Comp. Laws Supp. 1940, § 9932 *et seq.*, Stat. Ann. § 20.111 *et seq.*).—Reporter.

own name. If a legal partnership existed, these contracts would not pass to the legal representative of the defendant's estate in event of his death. The plaintiff, as surviving partner, would have the sole right to possession of the assets of the partnership to wind up the affairs of the partnership and pay over the net results to the legal representative of the defendant's estate. *Grigg* v. *Hanna*, 283 Mich. 443. There seems to be no claim that the private property of either of these parties would be subjected to payment of partnership debts in event of insolvency of a partnership. There must be a meeting of minds between two or more persons before a partnership (except by estoppel) can exist.

"The burden was on plaintiffs to prove the existence of the partnership they alleged. Have they established the fact of their association with Kirschbaum under an agreement to carry on as co-owners the tailoring business for mutual profit? As between plaintiffs and Kirschbaum the question of whether there was a partnership depended upon intention *mutually* entertained to be established by facts and circumstances." *Klein* v. *Kirschbaum*, 240 Mich. 368, 371.

"In the consideration of this vexing problem of whether a copartnership was established, it must be borne in mind that the burden of showing its existence is upon him who alleges it." *Fletcher* v. *Fletcher*, 197 Mich. 68, 72.

"In approaching the consideration of this question of fact the first and basic principle underlying a copartnership should be held in mind, namely, that consent of all the parties must be found in order to create such a relation.   *   *   *

"Having also in mind the well-established rule that in an attempt to establish a partnership *inter se* the burden rests upon him who seeks to prove it,

and that it must be established by preponderating evidence, we do not think that this record can be read and the conclusion arrived at that it was the intention of the parties involved to engage in a general copartnership for the purposes set forth by the plaintiff in his bill." *Bush* v. *Haire,* 197 Mich. 85, 87, 88.

The gist of the partnership relation is *mutual* agency and joint liability. *Penner* v. *DeNike,* 288 Mich. 488; *Lobato* v. *Paulino,* 304 Mich. 668.

By the uniform partnership act (2 Comp. Laws 1929, § 9846, as amended by Act No. 272, Pub. Acts 1941 [Comp. Laws Supp. 1945, § 9846, Stat. Ann. 1946 Cum. Supp. § 20.6]), a partnership is defined as follows:

"(1) A partnership is an association of 2 or more persons, which may include husband and wife, to carry on *as co-owners* a business for profit."

There is an absence of proof that these parties, during their dealings, considered themselves *as co-owners* of the business. Nor would the fact that they were co-owners, or shared gross returns of the business, necessarily establish a partnership. Nor would the receipt of commissions by plaintiff as a share of the profits of the business constitute more than prima facie evidence of a partnership, and if received as wages no such inference obtains.

"In determining whether a partnership exists, these rules shall apply: * * *

"(2) Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property;

"(3) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right

or interest in any property from which the returns are derived;

"(4) The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment: * * *

"(b) As wages of an employee or rent to a landlord." 2 Comp. Laws 1929, § 9847 (Stat. Ann. § 20.7).

While mutuality, a meeting of minds, and the intention of the parties, often must be gathered from a consideration of the circumstances, there are certain indicia of a partnership significantly lacking in this case. The absence of such indicia of partnership in the case at bar is strikingly similar to that in *Morrison v. Meister,* 212 Mich. 516, where the Court, in denying the existence of a partnership, said (p. 519):

"The record is convincing that there was no intention on the part of the defendants to form a partnership. Very few of the indicia of partnerships were present and most of them were absent. This was the only property they had a common interest in; there was no firm name, no firm funds, no firm accounts, no firm letterheads, no firm bank account, no commingling of funds or property, no certificate of partnership filed, no agreement as to losses, no time fixed when it would expire."

Also quite similar is *Cole v. Cole,* 289 Mich. 202, where the Court denied the existence of a claimed partnership in saying (p. 204):

"Defendant had been doing business under the name of the Independent Oil Company. After plaintiff came back from Augusta, Georgia, there was no change in the firm name, in the firm funds, in the firm accounts, in the firm letterheads, in the

bank account, and no commingling of plaintiff's funds with those of defendant. No certificate of partnership was filed, no agreement was made upon the part of plaintiff whereby he was to share in the profits or the losses, no time was fixed for the continuance of a partnership, and no time fixed for its expiration."

Although plaintiff here claims a partnership, and disclaims reliance on joint venture, the probability of the existence of a joint venture between these parties as to each of the various manufacturers' sales accounts does not necessarily constitute a partnership.

"The law governing this case is stated in the leading case of *Beecher* v. *Bush*, 45 Mich. 188 (40 Am. Rep. 465), as follows:

" 'Except when one allows the public or individual dealers to be deceived by the appearances of partnership when none exists, he is never to be charged as a partner unless by contract and with intent he has formed a relation in which the elements of partnership are to be found. And what are these? At the very least the following: Community of interest in some lawful commerce or business, for the conduct of which the parties are mutually principals of and agents for each other, with general powers within the scope of the business, which powers, however, by agreement between the parties themselves, may be restricted at option, to the extent even of making one the sole agent of the others and of the business.'

"See, also, *Canton Bridge Co.* v. *City of Eaton Rapids*, 107 Mich. 613; *Dutcher* v. *Buck*, 96 Mich. 160 (20 L. R. A. 776). Under this rule parties interested in a joint venture are not partners unless one of them has '(to quote other language from the opinion in *Beecher* v. *Bush*) 'clothed the other with an agency to act on his behalf in this business.' Tested by this rule there was no partnership."

*Brotherton* v. *Gilchrist,* 144 Mich. 274, 276, 277 (115 Am. St. Rep. 397).

Weighing the entire circumstances shown by the record, we can not escape the conclusion that the plaintiff has failed to sustain the burden of proving the existence of a partnership arrangement or agreement with the defendant. We are not called upon to determine whether the dealings between the parties constituted a joint venture as known in the law, nor whether the defendant might have been held liable for breach of an implied contract to pay plaintiff a share of commissions on business done since April 15, 1944, on the business transactions obtained through plaintiff's efforts. On the question before us, we conclude that the record does not support the decree entered in the circuit court.

A decree may be entered dismissing the bill of complaint, with costs of both courts to appellant.

CARR, C. J., and BUTZEL, BUSHNELL, SHARPE, REID, NORTH, and DETHMERS, JJ., concurred.