480 So.2d 1134 (1985)
Howard E. HULTS, et ux
v.
Henry L. TILLMAN.
No. 55113.
Supreme Court of Mississippi.
November 20, 1985.
Rehearing Denied December 18, 1985.
*1135 Pat H. Watts, Pascagoula, for appellants.
John G. Corlew, Frank J. Hammond, III, Watkins & Eager, Jackson, for appellee.
Before WALKER, P.J., and HAWKINS and DAN M. LEE, JJ.
HAWKINS, Justice, for the Court:
Howard E. Hults and his wife, Velma Hults, appeal from a decree of the Chancery Court of Jackson County adjudicating they were joint venturers in a contract for the sale of fill dirt and that Henry L. Tillman was entitled to one-third of the proceeds as such joint venturer.
Tillman has cross-appealed alleging error in the chancellor's requiring him to pay certain costs and expenses incurred.
*1136 The only issue we are required to address on this appeal is whether a joint venture relationship was ever established between the parties.
Finding there was no such relationship, we reverse and render on the direct appeal. This renders it unnecessary to address the cross-appeal, which we dismiss.

FACTS
Hults, 60, was in the seafood business in Jackson County, as majority shareholder in Hults Seafood, Inc., a family corporation. In late 1977 or 1978, Tillman a Jackson County lawyer, began representing Hults and the corporation. A native of Jackson County and with some familiarity with the fishing industry, Tillman represented Hults as general attorney, and also as an attorney with some expertise in marketing fish. They discussed developing a market for fish in Mexico, and made one trip together to Mexico. Tillman testified that he made other trips on Hults's behalf. Nothing ever materialized on this, however.
In 1980, following Hurricane Frederic, Hults was besieged with financial problems. The record is not clear whether Frederic caused, or merely contributed to his financial woes. He had involved himself financially in some off-brand religion, owed the Internal Revenue Service over $170,000, and seven or eight creditors had filed suit against him. Hults applied for a Small Business Administration loan. Tillman represented Hults in these varied legal affairs and involvements. Hults contemplated filing bankruptcy, and was quite depressed. Tillman counseled Hults not only as his lawyer but as a friend.
Hults and Mrs. Hults owned several hundred acres near the Alabama state line. In 1980 the public became aware that Chevron USA would expand its refinery in Jackson County. It is not clear from the record who of the two first learned that fill dirt from the Hults property might be a source of supply in the construction project, but in January or February, 1980, Hults and Tillman began discussing the prospect of selling fill dirt to Chevron. Tillman testified they agreed in March, 1980, they would divide the proceeds 60% to Hults and 40% to Tillman. Hults testified Tillman said he would have to be paid on a contingency fee basis, but the amount was never discussed until shortly before a contract was executed in December for sale of the dirt.
Tillman expended considerable time and effort in 1980 to assist Hults in securing a contract for the sale of the dirt. He talked with representatives of Chevron, Brown and Root (the prime contractor), members of the Board of Supervisors of Jackson County (as to the permit needed), the sheriff of Jackson County (about route to be traveled in supplying dirt from Hults's property), representatives of the Environmental Protection Agency, and studied regulations and specifications for dirt requirement. He secured soil sampling. Approximately 55 acres were involved in the dirt excavation area, and Tillman helped prepare the description following a survey. Tillman also went onto the property with interested parties, and discussed the area with representatives of dirt contractors and real estate agents.
Hults was not altogether passive, but discussed the prospect of selling dirt with certain of these representatives as well, and secured the survey, and a right-of-way from the Hultses property to a public road. The record indicates, however, that Tillman was far more active than Hults, and did virtually all the talking to prospects. Tillman testified he devoted practically all his time to trying to secure a contract, and reduced his secretaries from two to one.
Tillman was informed approximately 4,000,000 cubic yards of dirt would be required. He remembered the logistical problems involved in trucking the fill dirt in 1964 when the refinery was constructed. It was this knowledge which enabled him to anticipate some of the problems which would be encountered with removing and transporting dirt from the Hultses land, and prompted his contacting various county and state officials. Hults wanted to excavate the dirt himself, but Tillman advised against it.
*1137 On August 8, 1980, Tillman executed the following non-exclusive royalty agreement to Mid State James Paving Company:
NON-EXCLUSIVE ROYALTY AGREEMENT
I, HENRY L. TILLMAN, acting under the authority of owner, HOWARD E. HULTS, do hereby agree to sell to MID SOUTH JAMES PAVING COMPANY dirt removed from the property so described below for a period of the duration of the project for $0.25 a yard and provide the easement to the County Road known as Fort Lake Road.
WE, MID STATE JAMES PAVING COMPANY, agree to comply with the State and Federal requirements on permits agreed upon by the owner and contractor and secured by owner. Land to be restored to satisfy these permitted areas to the satisfaction laid out in said permits.
Land included is approximately Two Hundred (200) acres, more or less, North of Collins Creek, West of the Mississippi-Alabama State Line in Section 5, Township 6 South, Range 4 West, and/or Section 32, Township 5 South, Range 4 West.
 DATE: 8/8/80
 HOWARD E. HULTS
 BY: s/Henry L. Tillman,
  His Attorney
 HENRY L. TILLMAN
On August 29, 1980, Hults executed the following right to negotiate the sale of fill dirt to Tillman:
STATE OF MISSISSIPPI COUNTY OF JACKSON
I, HOWARD HULTS, hereby grant the exclusive right to negotiate with any and all parties for the sale, removal and transfer of any and all soil, dirt, sand, gravel or other material located on all properties which I own, in Jackson County, Mississippi and/or Mobile County, Alabama, during the period of construction of the Chevron U.S.A. project in Jackson County, Mississippi unto HENRY L. TILLMAN, said property being described in Deed Book 672, Page 241-44, Office of the Chancery Clerk.
WITNESS MY SIGNATURE, this the 29th day of August, A.D., 1980.
 s/Howard Hults 
 HOWARD HULTS
SWORN TO AND SUBSCRIBED BEFORE ME, this the 29th day of August, A.D., 1980.
 s/Kay Murray 
 NOTARY PUBLIC
STATE OF MISSISSIPPI COUNTY OF JACKSON
PERSONALLY APPEARED BEFORE ME, the undersigned authority in and for the aforesaid County and State, the within named, HOWARD HULTS, who acknowledged to me that he signed and delivered the above and foregoing instrument on the day and year therein mentioned as his free and voluntary act and deed.
GIVEN MY OFFICIAL HAND AND SEAL OF OFFICE, this the 29th day of August, A.D., 1980.
 s/Kay Murray 
 NOTARY PUBLIC
Tillman recorded this instrument on September 18, 1980.
On December 6, 1980, Tillman, on his legal stationery, wrote Patterson Enterprises, Inc., authorizing that firm to commence preliminary preparation for soil excavation "from the Hults property."
In the latter part of November or early December, 1980, there was a meeting in Tillman's office between Roy Brenson, project manager for Patterson Enterprises, Ltd., a dirt contractor; Miller Watson, a representative of T.L. James, another dirt contractor; W.C. Ford, owner of Ford Trucking Company; and Tillman. Hults also came to attend the meeting, but Tillman either suggested or instructed Hults that he not be present in the discussion. When the meeting terminated, Tillman told Hults he had agreed to a figure of 25¢ a cubic yard. Hults testified he was disappointed, since he had told Tillman he *1138 wanted to get 35¢ per cubic yard. Tillman testified he told Hults 25¢ per cubic yard was an excellent price, and that they were elated to get that, since they were afraid they might not get over 15 or 20¢ per cubic yard.
Brown and Root, a Texas corporation, as prime contractor of the construction of the refinery, subcontracted the supplying of fill dirt to Patterson Enterprises, Ltd., a Mississippi corporation, and T.L. James Company, Inc., a Louisiana corporation.
On December 12, 1980, Hults and his wife Velma, as Lessors executed a "lease Agreement" to these dirt contractors Patterson and James as Lessees, authorizing them to go upon the described property, excavate and remove dirt, and to compensate the Hultses at the rate of 25¢ per cubic yard. The lessor was to be paid on bi-monthly invoices. Dirt was to be measured by Brown and Root and approved on their delivery tickets. Tillman as notary public took the acknowledgment of the Hultses' signatures.
Section V. of this Agreement states:
WARRANTY OF TITLE AND OWNERSHIP
Lessor hereby warrants and agrees to defend the title to the leased premises and further warrants that he is the sole and only owner of the leased premises free and clear of all liens and encumbrances not subordinated to this lease. Lessor agrees to Indemnify Lessee from any and all claims by third parties based on rights of title or possession. In case of any title dispute or litigation, Lessee is hereby authorized to withhold payment until final adjudication or settlement of said disputes.
Tillman testified that in November, 1980, he and Hults discussed the division or compensation he was to receive, and the two of them agreed the division would be two-thirds to Hults and one-third to Tillman. Hults testified there had been no discussion as to the amount of fee that Tillman would ask until it became certain they would receive the contract in December, 1980, at which time Tillman called him to his office. According to Hults, Tillman first wanted 50%, and Hults offered 10%, but finally agreed on a one-third fee, Hults claiming he agreed to pay this after telling Tillman his creditors would have to come first. Hults testified he was disappointed because he thought they were going to get 35¢ per cubic yard and would sell 4,000,000 cubic yards. Only 2,250,000 were actually removed.
On October 15, 1980, Hults had paid Tillman $15,000 when Tillman said he needed some money. Tillman never made it clear precisely what this $15,000 was for.[1]
On January 19, 1981, Mr. and Mrs. Hults executed the following authority to Patterson Enterprises to make all payments under the lease agreement to Tillman:
STATE OF MISSISSIPPI COUNTY OF JACKSON
PERSONALLY APPEARED BEFORE ME, the undersigned authority in and for the aforesaid County and State, the within named, HOWARD E. HULTS and VELMA HULTS, who after first being duly sworn by me stated on their oath that PATTERSON ENTERPRISES, LTD., is hereby authorized to tender any and all checks as payment for mining operations to HENRY L. TILLMAN, Attorney at Law. Said payments are in accordance with that certain Lease Agreement dated December 12, 1980, and that certain Sub-Contract No. 34-1203-002-02010 between Chevron U.S.A.., Inc. Residuum Conversion Project and Patterson Enterprises, LTD.
 s/Howard E. Hults 
 HOWARD E. HULTS
*1139
 s/Velma Hults 
 VELMA HULTS
SWORN TO AND SUBSCRIBED BEFORE ME, this the 19th day of January, A.D., 1981.
 s/M.J. Thomas 
 NOTARY PUBLIC
In January, 1981 Tillman informed Hults he had discovered the farm lease between Bobby Lambert and Hults had been recorded, and this would have to be cancelled. Tillman expressed great concern over this. Lambert owed Hults $35,000 for purchase of farm equipment, fuel and farm rent. Hults and Lambert reached an agreement whereby Lambert cancelled the farm lease and Hults cancelled the debt.
When the dirt excavation and removal operations began, Tillman went to the property daily to set up a system of record keeping to accurately record the dirt removed.
Tillman's office submitted the bi-monthly invoices to Patterson Enterprises. At the bottom of each was typed: "Please send remittances to Henry L. Tillman, P.O. Box 1516, Pascagoula, Ms. 39567"
Hults regularly wrote Tillman a personal check for one-third of the proceeds received through April 17, 1981, with the exception of March 2, 1981, when Mrs. Hults signed a check. The checks for May 5 and May 19, 1981, and June 4 and June 18, 1981, were written by Hults Seafood, Inc., and signed by the secretary Linda McKay.[2]
At the end of May, 1981, Hults told Tillman his bills were piling up so that he would have to defer payment. He would, however, begin paying him again when he got caught up. Hults testified he had outstanding bills at that time of approximately $500,000. According to Hults, Tillman responded he had a lot of bills, also, but did agree to the deferment. In August, 1981, Tillman told Hults he needed some money for his daughter's college, and on August 28, 1981, Hults Seafood executed a check to Tillman for $5,000.
With this payment Hults had paid Tillman a total of $108,532 from the sale of the dirt. This figure excludes the October, 1980, check for $15,000.
Most of the check stubs from Hults Seafood show the payments to Tillman as attorney's fees. The secretary, Linda McKay, testified she was told by her employer these payments were attorney's fees.[3]
While Hults was receiving considerable income from the dirt proceeds, Hults Seafood had sustained very heavy losses. Hults had a certified public accountant from Jackson, who came to Pascagoula relative to Hults and Hults Seafood tax problems, and getting the corporate records current (e.g.: Tillman had not prepared some shareholder certificate to Hults's children). According to McKay there was a meeting in April, 1981, between Hults, Tillman, the accountant, and McKay. At this meeting the accountant told Tillman he was charging an excessive legal fee. Tillman responded, according to McKay, that he did not consider this a legal fee, that he "considered it a joint venture." This was the first mention of joint venture in this chronology of events.
Hults owed his brother Henry Hults approximately $80,000, which he had not paid. Henry Hults and his wife came to Mississippi in September, 1981, demanding payment. There was a meeting between Henry Hults and wife, Hults and Mrs. Velma Hults, Tillman and McKay. According to McKay, Hults told his brother he couldn't pay him because all the money he was *1140 receiving from the dirt pit operation was going into Hults Seafood, and the rest was "being paid in legal fees." Tillman replied that his agreement was with Hults and not Hults Seafood. Tillman also commented that Hults had held up payment for a while.
McKay, a long time acquaintance of Tillman's, recalled that one time when she met Tillman in his office, he remarked, "he generally charged 50% on a large bill like that when that much time was involved."
No more payments were made following this meeting. Hults wrote Tillman in September, 1981, terminating his services as attorney. Tillman filed a bill of complaint in the Chancery Court of Jackson County on October 21, 1981, alleging he and Hults were in a joint venture in the dirt excavation contract, that he was entitled to one-third, and he asked for judgment, an accounting, and a lien on any unpaid amount. Patterson Enterprises and James were made party defendants, and because the Hultses had conveyed the land to Henry Hults, he also was made a party defendant. Patterson Enterprises and James tendered all remaining sums due under the contract into court, and were released as parties.
The Hultses answered, denying there ever was any joint venture, that Hultses agreement to pay one-third fee was a result of undue influence and overreaching on the part of Tillman when he, Hults, was hard pressed, emotionally drained, and severely depressed, and that the agreement was void and should be held for naught. He also filed a cross bill asking for a refund of the fee, alleging any fee due Tillman should be paid on a quantum meruit basis.
When this case was heard in March, 1983, the total gross receipts in which Tillman had not participated were $256,470.84.
In his answer and cross bill, as well as at trial, Hults also claimed Tillman was negligent in not making a record title search of the Hultses' property prior to December 12, 1980, and accepting the Lambert farm lease, and that Tillman should have to bear the cost of settling with Lambert in the amount of $35,500. Tillman, on the other hand, said Hults knew of the farm lease and furthermore paid Lambert too much to get it released.
Roy Brenson, project manager for Patterson, testified as a witness for Tillman. In all his dealings Tillman never indicated he was acting in any other capacity than as attorney for Hults. Brenson said Patterson and James were joint venturers in the dirt sub-contract with Brown and Root.
John Orlander, general manager for James, also testified for Tillman. He said when Tillman signed the August 8, 1980, royalty agreement, he said he was a partner. Orlander also testified that Tillman had put in a lot of effort, skill and time, and he dealt with Tillman, rather than Hults.
At trial it all also developed Hults had paid a survey cost of $500, soil testing cost of $277 and $3,500 for the right-of-way from the Hultses' property to a public road.
Following hearing, the chancellor found there was a joint venture between the Hultses and Tillman, and that Tillman was entitled to one-third of all the dirt excavation proceeds. He found that one-third of the proceeds in which Tillman had not participated came to $85,490.28. He held that the farm lease cancellation was an expense of the venture, and also the October, 1980, check to Tillman an expense of the joint venture. All expenses thus listed totaled $54,770.
The chancellor found Tillman was obligated to pay one-third of the $54,770, leaving a net due him by the joint venture of $67,231.28, and entered judgment for Tillman against the Hultses in that amount. The chancellor also directed that the $43,461.23 tendered by Patterson Enterprises into court, less court costs, be paid directly to Tillman, and that a lien for the remainder of the judgment be impressed on the 55-acre tract involved in the dirt excavation. He assessed court costs one-third to Tillman and two-thirds to the Hultses.
The Hultses have appealed, and Tillman has filed a cross-appeal.

*1141 ISSUES
The direct appeal challenges the finding that the relationship was a joint venture, and also contends the Hults-Tillman agreement comes within the statute of frauds.
The cross-appeal claims it was error for the chancellor to assess Tillman one-third of $35,000, the total amount of the debts Lambert owed Hults, and satisfied in consideration of cancellation of the farm lease. Because $11,000 of the amount were debts due Hults Seafood, $6,000 for unpaid rent due under the farm lease (and Hults could have cancelled the lease for this breach), Tillman argues that at most he should only be assessed for one-third of the net remaining Lambert debt of $14,000.
The cross-appeal also claims it was error to assess Tillman one-third of the $15,000 paid him in October, 1980, by Hults Seafood, that this was for legal representation of Hults Seafood in other matters than the joint venture.
From the above issues it is apparent that if there was no joint venture between the parties, this settles the remainder. For the reasons set forth, we have concluded no joint venture existed.

LAW
The chancellor found that from the way Hults conducted his affairs, he and Hults Seafood merged. He did not think Tillman had overreached Hults because the dirt excavation contract was Hults's first profitable venture, and also if Tillman had been of an evil intent, he would have been more careful in preparing his documents. The chancellor held that it was through the joint efforts of Tillman and Hults that the dirt agreement was secured and Tillman had worked very hard and usefully in putting the project together.
Most convincing to the chancellor that this was a joint venture was Hults's own testimony that he agreed to pay Tillman one-third, and set up a system of payments to Tillman of one-third of the proceeds.
Tillman's able counsel has favored the Court in basing his claim on just one contention, that the relationship between the parties was a joint venture.[4]
The sole basis of the chancellor's award to Tillman was his entitlement as a joint venturer.
We have endeavored to fairly state all relevant facts from the record on the issue of whether this was a joint venture.

JOINT VENTURE GENERALLY
There is no difference between a partnership and a joint venture except the latter has limited and circumscribed boundaries. Indeed, the only purpose in distinguishing a joint venture from a partnership is to define a business relationship which is limited to specified undertakings for profit, rather than a general and continuing business of a particular kind. Sample v. Romine, 193 Miss. 706, 8 So.2d 257 (1942); Tansil v. Horlock, 204 So.2d 457 (Miss. 1967); Scott Co. of California v. Enco Construction Co., 264 So.2d 409 (Miss. 1972).[5] The legal principles for determining the existence of each are identical. See Thompson v. Thompson, Tex.Civ.App. *1142 1973, 500 S.W.2d 203; Federal Deposit Insurance Corp. v. Braemoor Associates, 686 F.2d 550 (C.A. 7th Cir.1982).
In State ex rel. Crane v. Stokke, 65 S.D. 207, 272 N.W. 811, 110 A.L.R. 761, 770 the South Dakota Supreme Court stated:
The concept of joint venture as a legal relationship or association sui generis is purely of American origin dating from about 1890. Just how or why it originated no one seems precisely to know.
In Stokke that court also observed that the name "joint venture" or "joint venturer" was first used not to describe the relationship between parties, but the use of the relationship, p. 771 A.L.R.
In Sample v. Romine, the leading Mississippi case on the subject, this Court first observed no exact definition could be given of a joint venture, the answer in each case depended upon the terms of the agreement, the acts of the parties, the nature of the undertaking and other facts. We broadly defined a joint venture as an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, efforts, skill and knowledge. We said it exists when two or more persons combine in a joint business enterprise for their mutual benefit with an understanding that they are to share in profits or losses and each to have a voice in its management. We noted a condition precedent for its existence was a joint proprietary interest in the enterprise and right of mutual control. The joint purpose of the enterprise distinguishes it from a mere tenancy in common. We further held an agreement, express or implied, for sharing in the profits is essential, but there need be no specific agreement to share in the losses, and if the nature of the undertaking was such that no losses other than those of time and labor in carrying it out was likely to occur, an agreement to share in the profits might stamp it as a joint venture, although nothing was said about the losses. We said a contract between the parties was necessary, but it need not be embodied in a formal agreement, but might be inferred from the facts, circumstances and conduct of the parties. Finally, we said it differed from a general partnership because it related to a single transaction, while a partnership usually related to a general and continuing business, and that a joint venture was of a shorter duration, and the agreement was less formal.
Williston on Contracts, 3rd Ed., Vol. 2, p. 550, 554, states: "Precise definition of a joint venture is difficult. The cases are of little help since they are generally restricted to their own peculiar facts."
... The joint venture is an association of two or more persons based on contract who combine their money, property, knowledge, skills, experience, time or other resources in the furtherance of a particular project or undertaking, usually agreeing to share the profits and the losses and each having some degree of control over the venture. Stated in somewhat greater detail:
"It can be said that joint adventure contemplates an enterprise jointly undertaken, that it is an association of such joint undertakers to carry out a single project for profit; that the profits are to be shared, as well as the losses, though the liability of a joint adventurer for a proportionate part of the losses or expenditures of the joint enterprise may be affected by the terms of the contract. There must be a contribution by the parties to a common undertaking to constitute a joint adventure; and a community of interest as well as some control over the subject matter or property right of the contract.
"Whether the parties to a particular contract have thereby created as between themselves, the relation of joint adventurers or some other relation depends upon their actual intention, and such relationship arises only when they intend to associate themselves as such. This intention is to be determined in accordance with the ordinary rules governing the interpretation and construction of contracts."
[Footnotes omitted]
*1143 See also: County of Riverside v. Loma Linda University, (1981), 118 Cal. App.3d 300 173 Cal. Rptr. 371, 376-377; Hayes v. Killinger, 235 Ore. 465, 385 P.2d 747 (1963); Coastal Plains Development Corp. v. Micrea, 572 S.W.2d 285 (Tex. 1978).
A joint venture might be characterized as a single shot partnership.
Having broadly defined a joint venture, we turn to the specifics of this case and the law on joint ventures as it has been refined and delineated beyond and since Sample v. Romine.

WHY THIS WAS NOT A JOINT VENTURE
A joint venture is a form of contract, and governed by contract law. Sample v. Romine, Tansil v. Horlock, supra. The first question is whether there was an intent to form a joint venture.
In Fewell v. American Surety Co., 80 Miss. 782, 793, 28 So. 755 (1902), this Court States:
As between the parties, in a joint venture, the usual test of a partnership is the intent of the persons to form one. If the parties do not intend to become partners, ordinarily they cannot be considered as such.
Clearly, there was no express agreement to form a joint venture. While a joint venture, as any other contract, may be inferred from the actions of the parties, there must be conduct from which an agreement may be found to exist. Sample v. Romine is a clear example. In that case, the conduct of Romine and his co-adventurers, coupled with statements of his two co-adventurers made to third parties, were convincing evidence that these three individuals contemplated a joint venture in securing oil and gas leases and mineral interests in Mississippi.
Yet, actual intent to form a joint venture is essential. As was held long ago in Hutchinson v. Birdsong, 211 App.Div. 316, 207 N.Y.S. 273 (1925), an agreement to share in profits and losses is not alone sufficient; there must be, in addition, an intention of the parties to be associated together as general partners, or for the more limited duration of a joint venture. As stated in Williston, supra, the relationship arises only when the parties intend to associate as such.
Hults emphatically denied any intent ever to form a joint venture. Tillman's conduct negated any intent to form a joint venture. On August 8, 1980, he signed a non-exclusive royalty agreement to Mid State James on behalf of Hults. While Orlander testified Tillman said he was a partner on that day, the fact remains Tillman signed the instrument as attorney for Hults.[6] Thereafter, on August 29, 1980, Tillman secured from Hults the exclusive right to negotiate for the sale of fill dirt, an agency relation. On December 6, 1980, on his attorney letterhead Tillman authorized Patterson to begin preliminary preparation for removal of the fill dirt. In none of this did the parties ever hold Tillman out to be anything other than the agent and/or attorney for Hults. Brenson, Tillman's witness, testified he never considered Tillman to be acting in any capacity other than attorney for Hults. It should also be noted that Brenson had some acquaintance with joint ventures.
On January 19, 1981, the Hultses authorized Patterson to tender all checks for the "mining operations" to "HENRY L. TILLMAN, Attorney at Law." Tillman prepared this document.
The checks from Hults Seafood to Tillman for one-third of the proceeds were stubbed as being for attorney's fees. The April 3, 1981, check from Hults to Tillman has a notation at the bottom that it is for "Attorney Fee."[7]
*1144 Tillman's statement to McKay was that his compensation was a "bill," hardly suggested a partnership.
Clear-cut evidence that Tillman did not consider himself a joint venturer with the Hultses was his conduct in the negotiations and execution of the lease agreement of December 12, 1980. Tillman knew that Patterson and James were joint venturers, having a common interest in the lease agreement, and each of these firms signed the document. The record discloses no reason for, or claim to secrecy, as to any partnership between Tillman and the Hultses. If such relationship had existed, and Tillman considered himself as having an interest in the contract itself, with obligations flowing from Patterson and James directly to him and the Hultses, as opposed to the Hultses alone, he surely would have advised all concerned in the presence of the Hultses that he and the Hultses were joint venturers. In this way he would have had a direct interest in the lease itself as opposed to a commission to be paid by Hults. By the same token, he would have had direct obligations to Patterson and James. Instead, he was content to permit the Hultses to assume all liabilities under the contract, and he took their acknowledgment as notary. This conduct was totally at odds with that of a person considering himself a partner in the undertaking with the Hultses.
Mrs. Hults was never consulted in any way relative to forming a joint venture. While it is true this lady is a housewife and presumably would sign whatever her husband requested her to sign, she nevertheless owned an undivided one-half interest in fee to the property. She was an essential party to a joint venture, and it is inconceivable that Tillman, an attorney, would contemplate the formation of a joint venture without her being apprised of what she was entering into. She knew she signed the lease agreement; she knew she signed the authority to Patterson to deliver checks from dirt proceeds to Tillman. She also signed one of the checks to Tillman for one-third of the dirt proceeds on hers and her husband's checking account. But, there is not one word of testimony suggesting she was made a party to any joint venture.
Nor can an intent to form a joint venture be created from Tillman's post factum characterization in May, 1981, of the relationship as a joint venture, after he had been criticized by a professional person for charging an excessive fee, and had been paid at least $70,000. This was the first time Tillman called it a joint venture in the presence of a third party.
The agreement between Tillman and Hults was clearly that of agency for the sale of dirt, for which Tillman was to receive a percentage of the proceeds, and also involved dealings as attorney and client. This intent, consistent throughout, without more, does not create a joint venture.
The chancellor's conclusion this was a joint venture was because each of the parties had mutual obligations which they performed, and there was a division of the proceeds. This was a basic syllogistic flaw in which the chancellor swapped the minor premise for the major. True, all joint ventures have the above ingredients, but these ingredients in and of themselves do not compel the conclusion this was a joint venture. And, whatever legal obligation the agreement between Hults and Tillman entailed, which we are not required to address, it did not constitute a joint venture.

UNIFORM PARTNERSHIP ACT AND JOINT VENTURES
In 1976 this state adopted the Uniform Partnership Act (UPA), Chapter 407, Laws 1976, Miss. Code Ann. § 79-12-1, et seq., the primary purpose of which was to codify the common law into one uniform act on partnerships.[8]
*1145 The Act makes no effort to distinguish or eliminate joint ventures from its provisions. In other states courts have held the UPA applicable to cases involving joint ventures. Federal Deposit Ins. Corp. v. Braemoor Associates, 686 F.2d 550 (C.A. 7th Cir.1982); Thompson v. Thompson, 500 S.W.2d 203 (Tex.Civ.App. 1973); Hayes v. Killinger, 235 Ore. 465, 385 P.2d 747, 750 (1963); Mobile Oil Corp. v. Hurwitz, 63 Ill. App. 3rd 430, 20 Ill.Dec. 372, 380 N.E.2d 49 (1978); Lau v. Valu-Bilt Homes, Ltd., 59 Hawaii 283, 582 P.2d 195 (1978).
Because for all practical purposes a joint venture is a miniature partnership, or a partnership limited in scope, it would be a trying proposition not to apply the same legal principles to them both. Putting the matter differently, if the UPA applies to all partnerships, it manifestly applies to joint ventures, except for possible exceptions in some very special cases.
Miss. Code Ann. § 79-12-11(1), defining partnership, states:
(1) A partnership is an association for two (2) or more persons to carry on as co-owners a business for profit.
There is nothing about this definition excluding our historical view of a joint venture. This statutory definition of a partnership is in accord with our common law rule on joint ventures that each has a "proprietary interest" in the undertaking and there is a mutual right of control. Sample v. Romine, 193 Miss. 706, 8 So.2d 257, 261 (1942); Bach v. Liberty Mutual Fire Ins. Co., 36 Wis.2d 72, 152 N.W.2d 911 (1967); Jenkins v. Brodnax Trucking Co., 437 S.W.2d 922 (C.A.Tex. 1969). See also: 48A C.J.S. Joint Ventures, § 11, and cases cited; 46 Am.Jur.2d Joint Ventures, § 12, and cases cited. "Co-owner" in the Act is synonymous with "joint proprietary interest," the term used in many cases.
As for a mutual right of control, the only control Tillman exercised was expressly delegated to him by Hults, and not as a co-owner, or one with community of interest. True, Tillman exercised substantial authority, but it was only as delegated to him by Hults. He never claimed more.
We do not imply that in order to constitute a partnership or a joint venture, it would have been necessary for Tillman to own an interest in the land from which the dirt was sold, but it was necessary that he have a proprietary interest in the lease agreement from which all blessings flowed. It was necessary that Tillman be a "co-owner" with the Hultses in that contract.
Also, it must be remembered in this case we are dealing with the rights of the parties between themselves, no third parties are involved.
It is first apparent that Tillman and Hults did not come under Miss. Code Ann. § 79-12-11(1), the definition of a partnership, because they did not carry on the undertaking as co-owners. Tillman represented Hults, and performed services. However, there is nothing to suggest he did anything more than act as agent and/or attorney.

SHARING OF GROSS RETURNS, OR PROFITS NO JOINT VENTURE HERE
The Act gives rules for determining the existence of a partnership. Miss. Code Ann. § 79-12-13 provides:
§ 79-12-13. Rules for determining the existence of a partnership.
In determining where a partnership exists, these rules shall apply:
* * * * * *
(3) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived.
(4) The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment;
* * * * * *
(b) As wages of an employee or rent to a landlord.
*1146 According to Tillman, the agreement was that Hults would pay him one-third of all the proceeds. If this was their agreement it was not a profit sharing arrangement, but an agreement under Miss. Code Ann. § 79-12-13(3) to share in the gross returns. The Act states this of itself does not establish a partnership. Again, this rule has common law precedent. See: Raymond S. Roberts, Inc. v. White, 117 Vt. 573, 97 A.2d 245, 248 (1953); Moore v. DuBard, 318 Mich. 578, 29 N.W.2d 94 (1947); Schleicker v. Krier, 218 Wis. 376, 261 N.W. 413 (1935).
According to Hults, he agreed to pay Tillman one-third after all his other bills were paid. If so, this indicates a sharing of profits under Miss. Code Ann. § 79-12-13(4). Again, if this was in the nature of wages or compensation for services rendered, then no inference of a partnership should be made. See § 79-12-13(4)(b). Cases illustrative of this rule are: Powell v. Bundy, (1954) 38 Tenn. App. 255, 272 S.W.2d 490 (two real estate brokers working together and dividing commissions equally); Devereaux v. Cockerline, 179 Or. 229, 170 P.2d 727 (1946) (profits may be mere compensation paid to one who has no interest in the profits as such, but who is employed as servant, agent or broker); Gutierrez v. Yancey, (C.A.Tex. 1983) 650 S.W.2d 169; Jenkins v. Brodnax White Truck Co., 437 S.W.2d 922 (C.A.Tex. 1983); 59 Am.Jur.2d Partnership, § 51, and cases annotated thereunder. See also, cases cited in 137 A.L.R. 125-127 and 161 for examples of percentages of profits received for services rendered which were held not to constitute a partnership.

NO AGREEMENT AS TO EXPENSES OR LOSSES
Sample v. Romine is authority that is not necessary that there be an agreement to share in the losses in order for there to be a joint venture. There is a split of authority on this, with the modern trend towards making agreement to share losses a necessity in every joint venture. See: 48A C.J.S. Joint Ventures, § 13, and cases cited; Hayes v. Killinger, 235 Or. 465, 385 P.2d 747 (1963); Fry v. Shaw, 508 S.W.3d 142 (C.A.Tex. 1974); Gutierrez v. Yancey, 650 S.W.2d 169 (C.A.Tex. 1983). The UPA requires a sharing of losses and expenses. Miss. Code Ann. § 79-12-35(1)(a). It is clear in this case Tillman did not consider himself obligated to pay Hults any of the expenses he incurred in securing the lease contract until the chancellor required him to do so.
We need not dwell on what the parties in Mississippi by express agreement can provide, how they will share expenses and losses, and still have a joint venture or partnership.
What is essential to any intent to form a joint venture is the idea that the parties are engaging in the undertaking with both parties owning the venture, with a right of mutual control, and joint obligations and liabilities. Joint Ventures are possible in a myriad of circumstances, as shown by the fertile imagination of entrepreneurs. Usually some capital and some skill is needed, sometimes a great deal of the former and little of the latter is needed, sometimes the reverse, and sometimes both. As a rule there is a venture involved in which there may be losses; as a rule there will be some expenses involved. As joint venturers the parties, having a community of interest, ownership and control in the undertaking, would most naturally have some discussion and understanding of some sort on expenses and possible losses, how they shall be borne and repaid. The contribution of capital to a joint venture is not a debt, but an investment, which the parties may or may not agree will be repaid from profits. The expenses incurred in promoting and consummating the venture frequently are met and paid from the capital contributed by one of the joint venturers, for which he is, as a general rule, entitled to be repaid, but not on a debt. That the payment into the enterprise by one of the parties is considered a debt due him by the other joint venturer individually is inconsistent with joint venturers. See: *1147 Boxwell v. Champagne, 229 Miss. 355, 91 So.2d 256 (1956).
When there is no discussion or agreement of any kind as to paying expenses incurred by each of the parties, as in this case, this is consistent with a simple agency relationship and no more. The principal pays his own expenses, and the agent recoups his expenses from the fee he receives.
Until Tillman went to court he never asserted any ownership or interest in the dirt contract. His interest was as a creditor of Hults for a portion of the proceeds, as agent receiving his commission. He undertook none of the liabilities or obligations of the lease. This was inconsistent with any person claiming a co-ownership in the contract, and unequivocally reveals Tillman never considered himself a joint venturer, or made any claim as such, until post facto it appeared in his interest to do so.
We need not address the contention of the Hultses that they were victims of fraudulent overreaching by their attorney, nor the ethical implications of Tillman's conduct as an attorney. These may be reserved for another forum.
We conclude there was never any intent on the part of the parties to engage in a joint venture, and none was ever formed. Tillman was therefore entitled to recover nothing on his complaint.
Having reached this conclusion it it unnecessary that we address the cross-appeal.
The judgment of the Chancery Court will be reversed and rendered on the direct appeal and judgment is entered here for the appellants; the cross-appeal will be dismissed.
REVERSED AND RENDERED ON DIRECT APPEAL; AFFIRMED ON CROSS-APPEAL.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
NOTES
[1] Tillman testified that he simply placed the $15,000 in the bank and that he never designated it to cover any particular service he had performed for Hults. Among the services Tillman testified he could have applied it toward were: legal work for Hults and Hults Seafood to help put Hults Seafood back on its feet following Hurricane Frederic, and travel and out-of-pocket expenses incurred by Tillman in securing the dirt pit contract.
[2] It is not clear from the record whether Hults would write these checks when he got the payment from Patterson Enterprises at Tillman's office, or whether Hults at some point in time began getting the Patterson Enterprise checks himself, and paying Tillman the one-third from the proceeds.
[3] The April 3, 1981, check is from the Hults's personal account. It is apparent that only the signature, "H.E. Hults," is in Hults's handwriting. The body of the check payable to Henry L. Tillman, in the amount of $12,750.58, and including the notation at the bottom left corner that it is for "Attorney Fee" is clearly in the handwriting of some person other than Hults.
[4] In oral argument, consistent with the position Tillman has taken throughout trial and appellate proceedings, his counsel stated Tillman made no claim to the proceeds except as a joint venturer with the Hultses.
[5] Williston on Contracts, 3rd Ed., Vol. 2, § 3188, p. 592, lists six distinguishing features from case law between partnerships and joint ventures:

(1) The single or ad hoc nature of the undetaking;
(2) The eligibility of corporations for membership;
(3) Absence or extreme limitation of agency relationship;
(4) Loss-sharing not essential;
(5) Action on contract;
(6) Status.
See also, Jaeger, Partnership or Joint Venture, 37 Notre Dame Law Review 138 (1961), where the author states, p. 158: "If these various differences are critically examined, some may seem more apparent than real." The adoption by the various states of the Uniform Partnership Act, discussed infra, makes no effort to distinguish a joint venture from a partnership and has encouraged courts to case them in the same mold insofar, at least, as determining the existence of either.
[6] Testimony as to Tillman's referring to himself in passing that he was a partner of Hults's, outside of Hults's presence, was incompetent, in any event. Sample v. Romine, 193 Miss. 706, 8 So.2d 257, 263 (1942).
[7] This check was probably written by someone in Tillman's office, perhaps his own office personnel. See Footnote 2, supra. If so, as late as April 3, 1981, Tillman's own employee had not gotten the word he was a joint venturer with the Hultses.
[8] The Act has other purposes as well, not relevant to this opinion. See 59A Am.Jur.2d Partnership, §§ 2, 3; 68 C.J.S. Partnership, § 2.