924 So.2d 611 (2006)
E.L. PENNEBAKER, Jr., Appellant
v.
Morris GRAY, Appellee.
No. 2004-CA-01893-COA.
Court of Appeals of Mississippi.
March 14, 2006.
*613 Gene Melvin Coxwell, attorney for appellant.
Michael P. Younger, Brandon, attorney for appellee.
Before LEE, P.J., IRVING and CHANDLER, JJ.
*614 CHANDLER, J., for the Court.
¶ 1. On January 23, 2003, E.L. Pennebaker, Jr. filed a "Complaint for Preliminary Injunction, for Replevin, for Damages, for Dissolution of Joint Venture, and for Other Relief" against Morris Gray. The complaint alleged that, pursuant to an agreement with Gray, Pennebaker had invested substantial money, labor, and equipment in the acquisition and development of certain property owned by Gray and in the mining of gravel located upon the property. The complaint further alleged that, on January 13, 2003, Gray had barred Pennebaker from accessing the gravel by locking the gate to the property.
¶ 2. After a preliminary hearing in the Chancery Court for the Second Judicial District of Hinds County, the chancellor allowed Pennebaker to go upon the property and remove gravel that he had under contract for sale. The chancellor granted Pennebaker's complaint for replevin and allowed him to retrieve equipment he owned and had left on the property. After a hearing on the merits, the chancellor found that no joint venture had existed between Pennebaker and Gray concerning the property or the gravel. However, the chancellor found that Pennebaker was entitled to relief in quantum meruit for his expenditures in laying a water line, for his part of jointly owned scales and equipment, and for his loss in the sale of a generator that he had purchased. Pennebaker appeals, arguing that the chancellor manifestly erred in concluding that Pennebaker and Gray were not parties to a joint venture.
¶ 3. Finding no error, we affirm.

FACTS
¶ 4. The testimony established that Pennebaker and Gray were close friends who had been involved in business deals together since the 1960s. Primarily, these deals centered upon the joint ownership and maintenance of mechanical equipment, as well as swapping various items of equipment for other equipment or for money. In early 1998, Pennebaker noticed that approximately 537 acres in Hinds County were being offered for sale at a good price. He told Gray about the property.
¶ 5. In April 1998, Gray bought the property, which was subdivided into two parcels, one containing 211.80 acres and one containing 326 acres. The property was subdivided to enable Gray to effect a tax swap of some of his other property for the 326 acres. The purchase price for both parcels totaled $355,000. The warranty and assumption deeds show that Gray was the deeded owner of both parcels. Pennebaker did not make any financial contribution toward Gray's purchase of the property. Within thirty days, Gray sold the 211.80 acre parcel, retaining all the profit from the sale for himself. Gray decided to keep the 326 acre parcel to use for hunting.
¶ 6. The testimony of Pennebaker and Gray differed materially as to the parties' understanding concerning the property and no writings memorialized any agreements between them. Pennebaker testified that the property was the subject of a joint venture between himself and Gray. The object of the joint venture was to develop the property for sale and then to split the profits equally. Pennebaker maintained that, though he had lacked funds to buy into the property, he had contributed to the acquisition of the property by facilitating Gray's purchase of it.
¶ 7. Pennebaker was experienced in the gravel business. Pennebaker testified that, when Gray decided to keep the 326 acre parcel for hunting, he and Gray decided that Pennebaker could reap his share of the profits from the 326 acres by mining *615 and selling gravel located on the property. Pennebaker testified that he and Gray anticipated that they would sell large amounts of gravel to the Horseshoe Casino that was planned nearby. In February 2001, anticipating his own gravel sales to the casino, Pennebaker sold a separate gravel pit that he owned with a restriction that the buyer could not sell gravel for five years. The planned casino was the subject of other litigation by Pennebaker. See Mississippi Gaming Com'n v. Pennebaker, 824 So.2d 552 (Miss.2002) (finding that the Mississippi Gaming Commission's determination that the planned casino site was not suitable for gaming was supported by substantial evidence); Harrah's Vicksburg Corp. v. Pennebaker, 812 So.2d 163 (Miss.2001) (reversing and rendering a $942,000 judgment in favor of Pennebaker that had been based on his claims that the defendants' conduct before the Mississippi Gaming Commission constituted restraint of trade, conspiracy, and tortious interference with contract).
¶ 8. At the preliminary hearing, Gray testified that, since Pennebaker had lacked funds to buy into the 537 acres, Gray bought it and gave Pennebaker a one-half interest in it. Pennebaker was to pay Gray for the one-half interest when his lawsuit concerning the casino was favorably resolved. Gray characterized this agreement as a "gentleman's agreement" that was made by telephone. Gray stated that, later, Pennebaker told Gray that he needed money and wanted to sell his one-half interest. Gray paid Pennebaker $40,000 in exchange for his interest, consisting of $33,000 in funds and $7,000 in the use of certain of Gray's equipment.[1] Pennebaker expressed an intention to repurchase his interest and to buy into the property if he received money from the casino litigation. Pennebaker and Gray agreed that Pennebaker could repurchase his one-half interest for $60,000 plus one-half the remaining balance of the original purchase price.
¶ 9. At the hearing on the merits, Gray characterized Pennebaker's initial interest in the property as an option to purchase a one-half interest. Gray stated that Pennebaker sold him the option for $40,000, consisting of $32,000 in funds and $8,000 in the use of equipment. Gray stated that the parties agreed that Pennebaker could repurchase the option for $60,000. If Pennebaker repurchased the option, he would have one year to exercise the option by purchasing a one-half interest in the land for one-half the remaining balance of the original purchase price.
¶ 10. Regardless of Gray's characterization of Pennebaker's initial interest in the property, it is undisputed that Pennebaker never paid Gray any funds toward the purchase of the property. Gray testified that Pennebaker had sold him any interest he had in the property. Gray denied ever agreeing that Pennebaker would get his share of the profits from a joint venture by selling gravel.
¶ 11. Pennebaker averred that the parties never agreed that he would have to buy a one-half interest in the land in order to be entitled to one-half of the profits from its sale. Pennebaker asserted that, from the start, he had a one-half interest in the property and, therefore, an entitlement to one-half of the profits from its sale or development. He maintained that Gray had never paid him for his interest.
¶ 12. Beginning in 1998, both Pennebaker and Gray removed gravel from the *616 property. The parties testified that they had considered running a gravel-washing operation on the property. In preparation for this project, Pennebaker purchased a generator. The parties jointly purchased some equipment, including a set of scales. However, before embarking on the gravel-washing operation, Gray and Pennebaker decided that washing gravel would be cost-prohibitive and they abandoned the idea. Pennebaker sold the generator for $1500 less than he had paid for it. The scales remained upon the property, along with the other equipment, and were never used.
¶ 13. The parties' removal of gravel from the property continued until Gray locked Pennebaker out of the property on January 13, 2001, prompting Pennebaker's filing of the complaint. Following is a summary of the parties' testimony concerning their gravel removal activities. Pennebaker uncovered, or mined, much of the gravel. Gray also mined gravel. Pennebaker used some of Gray's equipment to mine and move the gravel, and Gray used some of Pennebaker's to do the same. When Pennebaker used Gray's equipment, he paid for fuel and any necessary repairs. Pennebaker contributed $7500 in labor and expenses in laying a water line, to which Gray also contributed labor and expenses. Pennebaker also made improvements associated with the gravel pit, including the construction of unpaved roads and the installation of a culvert and a gate.
¶ 14. Pennebaker stated that he learned in summer 2002 that the casino plans had fallen through and, therefore, the parties' largest anticipated market for gravel had disappeared. The parties were both involved in facilitating the sale of gravel to Lampkin Construction Company, Inc. for a Warren County road project. Lampkin paid Gray for gravel with checks made payable to Gray alone. However, Pennebaker testified that Lampkin paid him for gravel with a check made payable to him alone.
¶ 15. Other than the gravel-washing operation, the defunct casino deal, and the Lampkin sale, the parties dealt with the gravel independently of one another. Both Pennebaker and Gray separately hauled gravel off the property and used it on their own individually held property. Pennebaker spread some of the gravel on a property known as Queen's Hill which the parties owned jointly. Pennebaker sold some of the gravel and kept the profits for himself. Gray sold some of the gravel and kept the profits for himself. When Gray locked Pennebaker out of the property, Pennebaker had several pending oral contracts for the sale of gravel from which he alone stood to profit.[2] Neither party kept any record of how much gravel he removed. Pennebaker stated that he had hauled gravel to thirty or forty places. Gray estimated that Pennebaker had removed $150,000 worth of gravel. He stated that the parties had discussed an arrangement whereby Pennebaker would begin paying for gravel, but that they later decided on a time limit for Pennebaker's removal of gravel.
¶ 16. In March or April 2002, the parties decided to wind up some of their affairs together. The parties jointly owned some property known as Queen's Hill. Pennebaker and Gray each held record title to a one-half interest in the Queen's Hill property. Pennebaker, individually, owned thirteen acres in Queen's Hill. Gray testified that, on March 28, 2002, he gave *617 Pennebaker $400,000 and a truck and trailer in exchange for Pennebaker's one-half interest in their jointly owned property at Queen's Hill, Pennebaker's thirteen acres, and Pennebaker's interest in a Natchez company.
¶ 17. According to Gray, as part of this exchange, Gray also told Pennebaker that he had until the end of 2002 to remove some gravel that he had uncovered on the 326 acres. Pennebaker thought this uncovered gravel was worth $75,000. Pennebaker recalled that a discussion occurred in April 2002 in which he told Gray it would take him "a year or so" to remove all of the gravel that he had uncovered. However, Pennebaker stated that they had never agreed that Pennebaker would remove the gravel by the end of 2002. Gray stated that, when he discovered that Pennebaker was still removing gravel in January 2003, he locked the gate.
¶ 18. In his complaint, Pennebaker prayed for a dissolution of his joint venture with Gray. At the preliminary hearing, Pennebaker asserted that he was entitled to the $75,000 worth of gravel that he had uncovered that remained on the property. However, at the hearing on the merits, Pennebaker averred that he was entitled to $275,000, which he testified represented one-half of Gray's profits from their joint venture to develop and sell the property. This figure included the $75,000 worth of gravel which Pennebaker had uncovered.
¶ 19. After the hearing, the chancellor found that no joint venture existed between the parties. The chancellor found that, when Gray bought the property, the parties had agreed that Pennebaker was to have an option to purchase a one-half interest in the property. The chancellor found that Pennebaker had sold Gray the option for $40,000, that Gray had offered to allow Pennebaker to repurchase the option for $60,000, and that, to "buy in," within one year, Pennebaker would have had to pay the remaining balance of the purchase price plus ten percent of the purchase price.[3] The chancellor found that Pennebaker had never repurchased his option to buy in or bought any interest in the property. The chancellor found that, as part of the parties' Queen's Hill deal, Pennebaker had agreed to remove all the uncovered gravel by the end of 2002. The chancellor found that there was no intent by the parties to enter into a joint venture, and that Pennebaker had failed to establish that they had "discussed or even mentioned how the alleged joint venture would be managed, now profits and losses would be shared, and who would be responsible for operations and expenses." The chancellor further found that the parties had not combined their "property, money, efforts, skill, and knowledge for a single business enterprise." The chancellor *618 did find that Pennebaker was entitled to recover in quantum meruit for the $7500 value of his labor in laying the water line, for his $1500 loss on the generator, and for his part of the jointly-owned scales and equipment, which was to be valued at a post-trial hearing. The chancellor found that Pennebaker was not entitled to further recovery in quantum meruit because his efforts on the property were partially for his own benefit in his sale of gravel.
¶ 20. Aggrieved, Pennebaker presents a single issue on appeal:

I. THE CHANCELLOR COMMITTED REVERSIBLE ERROR IN HOLDING THAT E.L. PENNEBAKER AND MORRIS GRAY HAD NOT ENTERED INTO A JOINT VENTURE.
¶ 21. This Court will not reverse the findings of a chancellor unless those findings were manifestly wrong, clearly erroneous, or when the chancellor applied an incorrect legal standard. Nichols v. Funderburk, 883 So.2d 554, 556 (¶ 7) (Miss. 2004). If the chancellor's findings were supported by substantial evidence, this Court may not reverse. Id. However, we afford de novo review to the chancellor's interpretation and application of the law. Id.
¶ 22. Pennebaker argues that the chancellor manifestly erred in concluding that there was no joint venture between himself and Gray. A joint venture has been broadly defined as "an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, efforts, skill and knowledge." Hults v. Tillman, 480 So.2d 1134, 1142 (Miss.1985). The conditions precedent for the existence of a joint venture are (1) a joint proprietary interest in the enterprise; and (2) a right of mutual control. Id. An agreement to share in the profits is essential, and both parties must actually intend to be associated as joint venturers. Id. at 1142, 1143. While it has been stated that there need be no specific agreement to share in the losses, Sample v. Romine, 193 Miss. 706, 727, 8 So.2d 257, 261 (1942), the absence of any discussion or agreement about paying the expenses of the venture may support the conclusion that no joint venture existed. Hults, 480 So.2d at 1147.
¶ 23. It is not necessary that each member of a joint venture make a capital contribution toward the enterprise. Sample, 193 Miss. at 729, 8 So.2d at 261. Rather, one party may provide funds and another may put up his labor, skills, or experience in furtherance of the venture. Boxwell v. Champagne, 229 Miss. 355, 365, 91 So.2d 256, 261 (1956). "The contributions may be in money, materials, services  something promotive of the enterprise." Sample, 193 Miss. at 726, 8 So.2d at 261.
¶ 24. While a contract is necessary to form a joint venture, no formal agreement is necessary. Id. at 727, 8 So.2d at 261. The existence of a joint venture may be inferred from the facts, circumstances, and conduct of the parties. Id. The proponent of a joint venture must prove the existence of the joint venture by a preponderance of the evidence. Davis v. Noblitt & Capers Elec. Co., Inc., 594 So.2d 610, 613 (Miss.1992). When the agreement is oral, "it is left to the court to resolve disputes based on the oral and documentary evidence presented, applying the preponderance of the evidence standard." Id.
¶ 25. A joint venture is indistinguishable from a partnership except that a joint venture is a business relationship limited to specified undertakings for profit, while a partnership undertakes general and continuing business of a particular kind. Hults, 480 So.2d at 1141. Thus, a *619 joint venture has been described as a "single shot partnership." Id. at 1143. However, a joint venture is usually of shorter duration and, therefore, embodied in a less formal agreement than a partnership. Sample v. Romine, 193 Miss. 706, 8 So.2d 257, 261 (1942).
¶ 26. A joint venture "exists in real property where there is . . . an agreement to combine money, effort, skill, and knowledge, and to purchase land for the purpose of reselling it or dealing with it at a profit." Sample, 193 Miss. at 728, 8 So.2d at 261. A joint venture can exist in real property even if only one party is listed on the deed. Id. at 729, 8 So.2d at 262. Real property that is the subject of a joint venture is held in trust for the venturers who are not named on the deed. Id.
¶ 27. We turn to Pennebaker's argument that the chancellor manifestly erred by concluding that no joint venture existed. In his appellate brief, Pennebaker discusses the evidence which he contends proved a joint venture. In so arguing, Pennebaker's essential contention is that the evidence was such that the chancellor could only have found that he and Gray were joint venturers. We find that the chancellor's decision that there was no joint venture was supported by substantial evidence and was not manifestly erroneous. As the joint venture question is the sole issue on appeal, we do not attempt to ascertain the nature of any other legal relationships between Pennebaker and Gray.
¶ 28. We first address the chancellor's finding that there was no intent between Pennebaker and Gray to enter into a joint venture. "What is essential to any intent to form a joint venture is the idea that the parties are engaging in the undertaking with both parties owning the venture, with a right of mutual control, and joint obligations and liabilities." Hults, 480 So.2d at 1146. Pennebaker testified that, when Gray bought the property, the parties intended to embark on a joint venture to sell the property and to split the profits. According to Pennebaker, when Gray decided to keep the 326 acre parcel, the earlier agreement was modified to allow Pennebaker to reap his share of the profits from the 326 acre parcel through the sale of gravel. Pennebaker testified that his contributions to the joint venture were his having found the property and his experience in the mining and selling of gravel.
¶ 29. This testimony conflicted with that of Gray, who stated that Pennebaker's initial interest in the property consisted of an opportunity for him to "buy in" by paying Gray one-half of the purchase price.[4] Gray further testified that Pennebaker had sold him this interest and had never repurchased it. Gray stated that the parties had never agreed that Pennebaker would get one-half of the profits that Gray would have made from the sale of the 326 acres by selling gravel. The chancellor rejected Pennebaker's testimony as to the parties' intent and accepted Gray's. As the fact-finder, it was within the chancellor's discretion to weigh the testimony about the parties' agreement and to determine that Gray's was more credible.
¶ 30. The facts, circumstances, and conduct of the parties supported the chancellor's finding that no joint venture existed. Notably, Gray did not give Pennebaker one-half of his profits from his April 1998 sale of the 211.80 acres, an act that would *620 have been consistent with Pennebaker's assertion that they had agreed to split the profits from the sale of the property. It was undisputed that Pennebaker and Gray used each other's equipment to mine, move, and sell gravel and that Pennebaker made improvements to the gravel pit. However, the evidence surrounding the parties' sale of gravel indicated that Pennebaker and Gray were acting individually and not as joint venturers in a gravel-selling business. The evidence established that Pennebaker and Gray each sold gravel for his own individual benefit. There was no showing that the parties ever discussed the management of the gravel pit or how profits and losses would be shared. Rather, each party, acting alone, sold gravel for his own personal profit. There was substantial evidence to support the chancellor's finding that Pennebaker failed to show by a preponderance of the evidence that the parties jointly owned a gravel-selling venture.
¶ 31. There was testimony tending to show that, in three instances, Pennebaker and Gray collaborated concerning the sale of gravel. Nonetheless, even assuming that there was substantial evidence from which the chancellor could have found that these collaborations were joint ventures, Pennebaker failed to show that he was entitled to any outstanding profits from them. Firstly, there was testimony from both parties that they worked together to effect the sale of gravel to Lampkin. While this evidence might have supported a finding of a joint venture to sell gravel to Lampkin, there was no evidence that each party had not received his share of the profit from the sale. Lampkin paid Gray by check, and Pennebaker admitted that he also had received a check from Lampkin. Secondly, there was testimony that Pennebaker and Gray had discussed conducting a gravel-washing business together, and that Pennebaker had purchased some equipment in anticipation of this business. But, the planned gravel-washing enterprise was abandoned before it began. The chancellor compensated Pennebaker for his losses on the equipment in quantum meruit. Finally, the parties had planned to sell gravel to the casino together. This plan was abandoned when the Mississippi Gaming Commission determined that the proposed casino site was unsuitable for gaming. Thus, any venture by Pennebaker and Gray to sell gravel to the casino was thwarted before it incurred profits or losses. We affirm the decision of the chancellor that Pennebaker was entitled to no recovery from Gray based upon a joint venture.
¶ 32. THE JUDGMENT OF THE CHANCERY COURT FOR THE SECOND JUDICIAL DISTRICT OF HINDS COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.
NOTES
[1] At the preliminary hearing, Gray first testified that he gave Pennebaker $50,000 in exchange for his interest, consisting of $33,000 in cash plus the use of equipment. Later in the same hearing, Gray stated that he had given Pennebaker $40,000 for his interest.
[2] At the preliminary hearing, the chancellor allowed Pennebaker, upon the fulfillment of certain conditions and with restrictions, to go upon the property and collect the gravel to fulfill these contracts. At the hearing on the merits, Pennebaker testified that he never did so because the gravel buyers had purchased gravel from other sources.
[3] In his brief, Pennebaker points out that there was no testimony to support the chancellor's finding that Gray demanded ten percent of the purchase price in addition to one-half of the remaining balance of the purchase price. Indeed, the information about the ten percent was derived from a "Time Line of Events" drafted by Gray's counsel and admitted into evidence during Gray's testimony. Gray's counsel stated that the timeline reflected Gray's testimony. However, Gray never testified that he demanded ten percent from Pennebaker.

The finding that Gray demanded ten percent of the purchase price was not supported by the evidence. However, the price which Gray required Pennebaker to pay for an interest in the property is not determinative of whether there was a joint venture between Pennebaker and Gray concerning the property and the gravel. Therefore, this finding does not render the chancellor's decision that there was no joint venture manifestly erroneous.
[4] We are focused on the parties' understanding of their activities together in order to evaluate the evidence of their intent to form a joint venture. Consequently, we do not address the enforceability of the parties' verbal agreements for the sale of land.