## IN THE SUPREME COURT OF MISSISSIPPI

### NO. 98-CT-00358-SCT

*CRYMES G. PITTMAN, J. R. ADAMS, MARY ALLEN, FRANK H. BELL, DR. RICHARD BLOUNT, STUART C. BRODIE, BILLY CLEMENTS, JOHN H. CLEMENTS, ROY L. HATHCOCK, H. JULIAN HENDRICK, CARL HERRIN, FRANK JONES, JOHN LUCKETT, DR. J. O. MANNING, DR. MIKE MOCKBEE, RIVES NEBLETT, GUS PRIMOS, PETER K. SMITH, J. H. THAMES, DR. R. FASER TRIPLETT AND TRIPLETT INVESTMENT CLUB*

*v.*

*WEBER ENERGY CORPORATION AND SHIPLEY PRODUCTION COMPANY*

### ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 07/08/1997 |
| TRIAL JUDGE: | HON. DENISE OWENS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | JOSEPH E. ROBERTS, JR. |
| | CRYMES M. PITTMAN |
| ATTORNEY FOR APPELLEES: | KELLY D. SIMPKINS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED AND RENDERED -07/19/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 8/9/2001 |

**EN BANC.**

**McRAE, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Weber Energy Corporation ("Weber") and Shipley Production Company ("Shipley") executed an agreement to explore certain land in Texas for oil and gas. Shipley sold shares of its interest to various Mississippi Investors ("Investors"). The exploration was unsuccessful and the venture incurred substantial cost overruns. Weber sought to recover some of the costs from the Mississippi Investors. One of the Investors sued for a declaratory judgment against Weber in Hinds County Chancery Court. Weber counterclaimed against all of the Mississippi Investors. The chancery court found in Weber's favor, and the Investors appealed. The Court of Appeals affirmed the decision of the trial court, and we subsequently granted certiorari. Finding that the chancellor and the Court of Appeals imposed liability on the Investors for costs which were beyond the scope of their liability, we reverse and render.

### FACTS

¶2. By an instrument captioned "Joint Venture Agreement" but hereafter referred to as the "Agreement," Weber and Shipley signed a contract whereby Shipley acquired 50% of Weber's interest in four oil prospects ("Initial Four Prospects") in the Hardeman Basin in Texas. In addition to providing for Shipley's acquisition of a 50% share in the Initial Four Prospects, the Agreement provided that the parties were

entering into a "joint venture" to acquire other prospects. Part of the money Shipley paid to acquire its interest was to be applied toward acquiring any additional prospects. Ostensibly, the overall plan was to reenter old and unprofitable vertical wells and to drill new and profitable horizontal wells in the Hardeman Basin. The Agreement provided that the rights, interests and obligations of the parties could be transferred in whole or in part. However, in the event of assignment, the assigning party would remain primarily liable for the performance of its obligations.

¶3. Under the Agreement, Weber would reenter the Weeth #1 Well as the Initial Well. The Weeth #1 was located on one of the Initial Four Prospects. The Agreement provided the essential terms for drilling of this Initial Well. Although the Agreement provided that the Initial Well was to be drilled to a certain horizontal length, it further provided that actual drilling operations might necessitate changes in the proposed plan "as they occur." Attached to the Agreement was an Authority for Expenditure ("AFE") which indicated total dry hole costs on the Initial Well in the sum of $392,075. The Agreement recited, however, that "Shipley understands that such AFE cost and expenses are estimates by Weber and Shipley agrees to bear and pay its 50% share of all actual costs and expenses." Future operations were to be conducted pursuant to a Joint Operating Agreement ("JOA") attached and incorporated into the Agreement. The Joint Operating Agreement stipulated that the Initial Well would be drilled in accordance with the terms of the Agreement.

¶4. Shipley, a Mississippi corporation owned by Jim Poole, then executed agreements ("Term Sheets") with Shipley's Investors. The Term Sheets specifically described only the Initial Four Prospects acquired by Shipley from Weber under the Agreement. Under the terms of the Term Sheets, each Investor agreed to participate as an owner of a working (i.e., cost bearing) interest. Significant provisions of the term sheets were as follows:

> That (co-venturer) agrees to be bound by the [JOA] as agreed to by [Shipley and Weber] and that (co-venturer) agrees to pay his (percentage) of costs under the agreement.

> . . . . . . . . . . . . . .

> Co-venturer hereby represents that he is familiar with the risks and further represents that he is capable of bearing the financial risk associated with this venture.

> SPC and co-venturer agree that a complete agreement setting forth the terms of their relationship is forthcoming.

¶5. The Initial Well proved to be an expensive dry hole. It took four tries for the driller to have any success in drilling the well in order to evaluate the objective. Instead of the estimated dry hole costs of $392,075 per the AFE, the well actually cost $750,788.

¶6. Weber began invoicing Shipley for its share of costs. Shipley refused to pay, apparently because of the amount of the cost overruns and Shipley's questions about the operations. Weber sued Shipley in Texas and obtained a default judgment, whereupon Shipley went into bankruptcy and became judgment proof. Weber learned about the Term Sheets and began pursuing Shipley's Investors for the costs. One of the Investors, Crymes Pittman, sued Weber for declaratory judgment in Hinds County Chancery Court. Weber counterclaimed against all of the Investors on theories of joint venture and contract.

¶7. In her Memorandum Opinion and Order, the chancellor found that the "Hardeman enterprise was a joint venture between Weber and through Shipley, the [Investors]." The chancellor found that the Term Sheets

were clear and would bind the Investors to a share of the drilling costs, and that the cost overruns were reasonable. The Final Judgment gave Weber a judgment against the Investors for the amount of the overruns, plus interest. Included in the judgment as part of the cost overruns were expenditures made by Weber on properties other than the Initial Four Prospects. There was at best conflicting evidence regarding whether the Investors intended to be included in the costs of any properties other than the Initial Four Prospects.

¶8. The Investors appealed and the matter was assigned to the Court of Appeals, which in a 4-3-2 decision, affirmed the judgment of the chancellor. The Court of Appeals found that there was a joint venture between Weber and the Investors through Shipley, because the basic requirements of a joint venture, as set out in *Sample v. Romine*, 193 Miss. 706, 8 So. 2d 257, 260-61 (1942), and *Hults v. Tillman*, 480 So. 2d 1134, 1143 (Miss. 1985), had been met. The Court of Appeals further found that each Investor specifically agreed, per the Term Sheets, to be bound by the terms of the JOA, which contained specific provisions regarding the allocation of profits and losses, and that the Term Sheets are unambiguous. This Court subsequently granted certiorari to consider the issues.

## ANALYSIS

¶9. The Investors contend that the lack of mutual control between Weber and the Investors precludes a finding that a joint venture existed. They assert that the Court of Appeals overlooked the fact that in *Hults*, *supra*, this Court indicated that a joint venture includes rights of mutual control. They argue that the Investors merely invested in the project, that they had no contact with Weber and that they never participated in any decisions. In short, they argue, they did nothing more than invest. They further argue that the Term Sheets, by their very terms, are ambiguous on their face because they state that "a complete agreement setting forth the terms of their relationship is forthcoming," and therefore preclude any obligation on behalf of the investors. We find these arguments to be persuasive.

¶10. In *Hults v. Tillman*, 480 So. 2d 1134, 1143 (Miss. 1985), this Court stated:

In *Sample v. Romine*, the leading Mississippi case on the subject, this Court first observed no exact definition could be given of a joint venture, the answer in each case depended upon the terms of the agreement, the acts of the parties, the nature of the undertaking and other facts. We broadly defined a joint venture as an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, efforts, skill and knowledge. We said it exists when two or more persons combine in a joint business enterprise for their mutual benefit **with an understanding that they are to share in profits or losses and each to have a voice in its management. We noted a condition precedent for its existence was a joint proprietary interest in the enterprise and right of mutual control**. The joint purpose of the enterprise distinguishes it from a mere tenancy in common. We further held an agreement, express or implied, for sharing in the profits is essential, but there need be no specific agreement to share in the losses, and if the nature of the undertaking was such that no losses other than those of time and labor in carrying it out was likely to occur, an agreement to share in the profits might stamp it as a joint venture, although nothing was said about the losses. We said a contract between the parties was necessary, but it need not be embodied in a formal agreement, but might be inferred from the facts, circumstances and conduct of the parties. Finally, we said it differed from a general partnership because it related to a single transaction, while a partnership usually related to a general and continuing business, and that a

joint venture was of a shorter duration, and the agreement was less formal.

**Hults** at 1142 (emphasis added). We continued:

> The joint venture is an association of two or more persons based on contract who combine their money, property, knowledge, skills, experience, time or other resources in the furtherance of a particular project or undertaking, usually agreeing to share the profits and the losses and each having some degree of control over the venture. Stated in somewhat greater detail: "It can be said that joint adventure contemplates an enterprise jointly undertaken, that it is an association of such joint undertakers to carry out a single project for profit; that the profits are to be shared, as well as the losses, though the liability of a joint adventurer for a proportionate part of the losses or expenditures of the joint enterprise may be affected by the terms of the contract. There must be a contribution by the parties to a common undertaking to constitute a joint adventure; and a community of interest as well as some control over the subject matter or property right of the contract. "Whether the parties to a particular contract have thereby created as between themselves, the relation of joint adventurers or some other relation **depends upon their actual intention, and such relationship arises only when they intend to associate themselves as such.** This intention is to be determined in accordance with the ordinary rules governing the interpretation and construction of contracts."

**Hults**, 480 So. 2d at 1143 (quoting *2 Williston on Contracts*, at 550, 554) (footnote omitted in original) (emphasis added).

¶11. Here, there was no express agreement between Weber and the Investors. Indeed, Weber did not even know the identities of the Investors until well after the drilling operations had ceased and legal action had been initiated in Texas by Weber against Shipley. Ben Weber, the president of Weber Energy Corporation, testified that he made the deal with Shipley and that what Shipley did with its interest was its business. Additionally, the Investors had no control over the day to day operations of the drilling. In fact, the Investors never made any decisions relating to the drilling operations, nor could they, because they were kept totally uniformed by Weber. Weber was only obligated to keep Shipley informed, not the Investors. It is patently obvious that the Investors did not have the right of mutual control, and that there was no intent on the part of Weber and the Investors to associate themselves as a joint adventurers.

¶12. Furthermore, contrary to the findings of the chancellor and the Court of Appeals, the Term Sheets are ambiguous. The Agreement between Weber and Shipley explicitly states that a "joint venture" is created, but only in regard to the acquisition of new properties. The Term Sheets, however, reference only the Initial Four Prospects. The Term Sheets also state that a complete agreement between Shipley and the Investors setting forth the terms of the relationship will be forthcoming, yet that agreement never materialized.

¶13. Because the Terms Sheets are ambiguous, it is necessary to use parol evidence to determine the intent of the parties. ***Knight v. Sheppard Bldg. Supply, Inc.***, 537 So. 2d 1355, 1358 (Miss. 1989). Both the Appellants and Jim Poole, the president of Shipley, testified that the Investors were only obligated up to the amount of their original investment and nothing more. Clearly this testimony demonstrates that there was no intent for the Investors to enter into a joint venture with Weber.

¶14. Finally, Miss. Code Ann. § 79-12-13(5), which is part of the Uniform Partnership Act, provides that "[o]peration of a mineral property under a joint operating agreement does not of itself establish a partnership." That provision is applicable to joint ventures because of the similarity between partnerships

and joint ventures. *Duggins v. Guardianship of Washington*, 632 So. 2d 420, 427 (Miss. 1993). The foregoing provision, coupled with the language in Art. VII.A. of the Joint Operating Agreement which provides that "it is not the intention of the parties to create, nor shall this instrument be construed as creating, a mining partnership or association, or to render the parties liable as parties," makes it clear that the Joint Operating Agreement does not control, and further, that it was not the intent of the Investors to enter into a joint venture with Weber.

¶15. We therefore find that there was no joint venture between Weber and the Investors, and reverse and render the decision of the Hinds County Chancery Court and the Court of Appeals.

## CONCLUSION

¶16. The Investors in this case did not have the right of mutual control over the drilling project in this case. Further, because the Term Sheets were in fact ambiguous, we must resort to parol evidence in order to determine the intent of the parties. In this case, there was ample evidence to demonstrate that it was never the intent of the Investors or Weber to enter into a joint venture, and therefore we reverse and render the judgments of the chancellor and the Court of Appeals.

¶17. **REVERSED AND RENDERED.**

**PITTMAN, C.J., MILLS, WALLER, DIAZ AND EASLEY, JJ., CONCUR. SMITH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BANKS, P.J., AND COBB, J.**

**SMITH, JUSTICE, DISSENTING:**

¶18. In my view, the business deal at issue was a joint venture as indicated by the express language in the Operating Agreement, and due to the required elements set out in *Hults v. Tillman*, 480 So.2d 1134, 1142 (Miss. 1985). Therefore, the majority's decision to reverse and render this cause is incorrectly decided. I would affirm the chancellor and the Court of Appeals. Accordingly, I respectfully dissent.

¶19. This Court has written:

> In *Sample v. Romine*, the leading Mississippi case on the subject, this Court first observed no exact definition could be given of a joint venture, the answer in each case depended upon the *terms of the agreement*, the acts of the parties, the nature of the undertaking and other facts. We broadly defined a joint venture as an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, efforts, skill and knowledge. *We said it exists when two or more persons combine in a joint business enterprise for their mutual benefit with an understanding that they are to share in profits or losses and each to have a voice in its management. We noted a condition precedent for its existence was a joint proprietary interest in the enterprise and right of mutual control.* The joint purpose of the enterprise distinguishes it from a mere tenancy in common. *We further held an agreement, express or implied, for sharing in the profits is essential, but there need be no specific agreement to share in the losses, and if the nature of the undertaking was such that no losses other than those of* time and labor in carrying it out was likely to occur, an agreement to share in the profits might stamp it as a joint venture, although nothing was said about the losses. We said a contract between the parties was necessary, but it need not be embodied in a formal agreement, but might be

inferred from the facts, circumstances and conduct of the parties. Finally, we said it differed from a general partnership because it related to a single transaction, while a partnership usually related to a general and continuing business, and that a joint venture was of a shorter duration, and the agreement was less formal.

*Hults*, 480 So.2d at 1142 (emphasis added).

¶20. It is my view that the Term Sheet was unambiguous and the Investors' arguments lack merit. First, as the Court of Appeals aptly noted, the express terms of the Term Sheet clearly set forth an agreement for sharing the profits:

That (name of the co-venturer) shall participate as to a (percentage) working interest in the venture, said working interest being subject to a twenty-five (25%) royalty burden.. . . (name of the co-venturer) agrees that (his/her) (percentage) working interest shall be reduced by 20% after pay-out, on a prospect by prospect basis.

¶21. Moreover, under the Operating Agreement, as agreed by Shipley and Weber, there is a specific provision for the allocation of losses:

B. Interests of Parties in Costs and Production: Unless changed by other provisions, ***all costs and liabilities incurred in operations*** under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A".

In addition to the language detailing the profit-sharing, the Term Sheet also states in unequivocal terms, that each co-venturer shall have a "working interest" based on his or her percent of their assignment. The chancellor stated that a "'working interest' is virtually synonymous with the term 'leasehold interest.' The working interest owner bears the expense of exploration, drilling, and producing oil and gas. . . It is contrasted with the landowner's royalty interest, which bears no part of the production expense." (citing ***OXY, USA, Inc. v. Colorado Interstate Gas Co.***, 883 P.2d 1216, 1224 (Kans. Ct. App. 1994)).

¶22. The majority concludes that the requirement that joint venturers have a "right of mutual control" is lacking. The express terms of the Operating Agreement set out the control the Investors have in this project. As the Court of Appeals noted, Article V, Operator, subparagraph B.1, provides for the removal of the operator, Weber, in specific situations by the non-operators, Pittman: "Operator may be removed if it fails or refuses to carry out its duties hereunder, or become insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit 'A'. . ." The Court of Appeals further noted that the Operation agreement provided measures in which the non-operators, Pittman, may propose additional drilling with the contract area. Moreover, further managerial decisions are available to non-operators, Pittman, wherein the unanimous "consent of all parties" the prospected wells may be "drilled or deepened" and "reworked or plugged back." In so agreeing to being bound by the Operating Agreement, as agreed by Shipley and Weber, each co-venturer obtained the "right of control."

¶23. Although it is unfortunate for these investors, it is obvious that the chancery lower court and Court of Appeals made the correct decision. This was a joint venture as indicated by the express language in the Operating Agreement, and due to the required elements set out in ***Hults***.

¶24. Therefore, I respectfully dissent.

**BANKS, P.J., AND COBB, J., JOIN THIS OPINION.**