# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CC-00013-SCT

*RONNIE ALEXANDER, ET AL.*

*v.*

*MISSISSIPPI DEPARTMENT OF EMPLOYMENT SECURITY AND MISSISSIPPI POLYMERS*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/06/2007 |
| TRIAL JUDGE: | HON. PAUL S. FUNDERBURK |
| COURT FROM WHICH APPEALED: | ALCORN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | CHARLES R. WILBANKS, SR. |
| ATTORNEYS FOR APPELLEES: | LEANNE FRANKLIN BRADY |
| | WENDELL H. TRAPP, JR. |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 11/06/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     Aggrieved by the Alcorn County Circuit Court's judgment affirming the Mississippi Department of Employment Security's denial of unemployment benefits, Ronnie Alexander and ninety-seven other employees of Mississippi Polymers, Inc., appeal to us. Finding no error, we affirm.

**FACTS AND ADMINISTRATIVE PROCEEDINGS**

¶2. On November 29, 2006, Mississippi Polymers, Inc. (MPI), located in Corinth, issued a memorandum to employees entitled "Volunteers to Work Christmas Shutdown." This memorandum stated that the year-end inventory would be performed during the first shift on Monday, December 18, 2006, and if necessary, on Tuesday, December 19, 2006; that four people from the 1A shift/crew were needed to work in Plant Service "during the Christmas shutdown" with the work beginning at 7:00 a.m. on December 18, 2006, and ending at 3:00 p.m. on January 2, 2007, except that no work would be performed from December 22, 2006, through December 25, 2006, and from December 29, 2006, through January 1, 2007; and that volunteers were needed to perform equipment maintenance from December 17, 2006, through January 2, 2007, except that, just as with the work in Plant Service, no maintenance work would be performed from December 22, 2006, through December 25, 2006, and from December 29, 2006, through January 1, 2007. The memorandum further provided that workers wishing to volunteer should sign one of the posted volunteer lists, which would be removed on Friday, December 8, 2006, at 7:00 a.m. Finally, this memorandum referenced the Labor Agreement which MPI had with Local Union No. 759L and the United Steelworkers of America "concerning crew bonuses and shift premiums for this shutdown work," and further provided that "[m]aintenance volunteers will be paid a shift/crew premium for whatever shift/crew they work during the shutdown." If more volunteers signed up than were needed, the volunteer workers would be chosen based on seniority, consistent with the Labor Agreement.

2

¶3.	Also on November 29, 2006, a notice to all employees referencing "2006 Christmas and New Year's Holidays" was posted on bulletin boards throughout the MPI facility. This notice provided information very similar to the just-discussed memorandum. Also, this notice stated, *inter alia*, that continuous operating schedules for the Calendar, Laboratory, Quality Control, Shipping, Plant Service, and Materials Departments would be suspended from 7:00 p.m. on Sunday, December 17, 2006, until 7:00 p.m. on Tuesday, January 2, 2007; and that noncontinuous operations, including Laminating, Print, Inspection, Laboratory, Quality Control, Plant Service, and Shipping, would be suspended from 3:00 p.m. (and Materials from 11:00 p.m.) on Friday, December 15, 2006, until 7:00 a.m. on Wednesday, January 3, 2007. This notice likewise stated that Friday, December 22, and Monday, December 25, would be observed as the Christmas Holidays; and that Friday, December 29, and Monday, January 1, would be observed as the New Year's Holidays.[1]

¶4.	On December 20, 2006, Ronnie Alexander, along with ninety-seven other MPI employees (claimants),[2] filed unemployment benefit claims with the Mississippi Department of Employment Security (MDES).[3] On December 21, 2006, Donna Weston, MPI Human Resources Manager, wrote a letter to Dale Groves at the MDES claims center in Corinth.

---

[1]Article V, Section 5 of the Labor Agreement provided for holiday pay for the therein specified holidays, including the Christmas and New Year's holidays.

[2]For the sake of clarity, we will refer to these employees who filed claims for unemployment benefits either as "claimants" or collectively as "Alexander."

[3]All of the other employees filed their claims within a few days of Alexander's filing.

This letter confirmed a telephone conversation between Weston and Groves and explained that the "maintenance shutdown" from December 17, 2006, until approximately January 2, 2007, "is not a lack of work situation" and that "[w]e have had these type shutdowns for thirty plus years." This letter also confirmed the fact that after conferring with the MDES office in Jackson, Groves informed Weston that MPI employees "would not be eligible for the benefits during this [shutdown] period." Finally, the Weston-to-Groves letter confirmed that on December 21, 2006, MPI had received more than fifty claims for unemployment benefits but that Groves had advised Weston that, since MPI had previously informed MDES that "this was not a lack of work situation but instead a designated maintenance shutdown . . . the employees are not eligible for benefits."

¶5.    On January 9, 2007, MDES sent the claimants a Notice of Nonmonetary Decision, which stated, *inter alia*:

> It is found that, with respect to your employment status, the weeks ending December 23, 2006, [and] December 30, 2006, are a designated holiday recess or vacation period. Your continued claims for such weeks are, therefore, disallowed because you were not available for work within the meaning of the Law.

However, on February 23, 2007, MDES sent MPI a Notice to Employer of Claims Determination which stated that MDES had determined that MPI "was not closed due to a designated holiday or vacation period during the weeks ending December 23, 2006 and December 30, 2006," and that, therefore, "the decisions denying benefits to individuals who filed claims for unemployment benefits during this time have been reversed." MPI promptly appealed this adverse ruling.

4

¶6.     On April 24, 2007, a hearing was conducted before the MDES, Administrative Law Judge Cindy C. Gill presiding.  The sole issue considered was "whether or not the claimant [was] prima facie unavailable for work due to a holiday period or vacation for week(s) ending December 23, 2006, and December 30, 2006." Weston testified that all of the claimants were still currently employed at MPI.  Weston likewise testified that the plant was not in operation during the weeks in question because it was "closed due to a maintenance shutdown that we have each year to perform maintenance work on the equipment, machinery and equipment that cannot be completed when the plant is in operation."  Weston stated that the scheduled maintenance shutdown had occurred each year for the almost-thirty years that she had been employed at MPI and that she believed the shutdowns had occurred even before she began working there.  The machinery had to be completely shut down to do the scheduled maintenance, she said.  The normal procedure each year was that notices were posted on bulletin boards and given to the union president in the late months of the year to inform employees of the specific dates of the yearly shutdown.

¶7.     The notice for the 2006 shutdown was posted on November 11, 2006, and this notice was entitled "2006 Christmas and New Year's Holidays."  The notice included a note which stated "Friday, December 22 and Monday, December 25 will be observed as the Christmas Holidays.  Friday, December 29 and Monday, January 1 will be observed as the New Year's Holidays." MPI's agreement with the claimants' union stated that employees would have Christmas Eve, Christmas Day, New Year's Eve, and New Year's Day as paid holidays. Each of these holidays was defined by the agreement as being twenty-four hours.  If one of

5

the paid holidays fell on Saturday or Sunday, MPI designated the Friday before or the Monday after as the paid holiday. Accordingly, the employees received four days of pay during the holiday shutdown and no pay for the remaining days. Weston testified that the entire shutdown was not a holiday shutdown, but instead it was a maintenance shutdown. Employees who were not selected to work during the shutdown were paid only for the four designated holidays. Memos concerning the shutdown period dating back to 1991 were submitted as part of the record at the hearing. According to these yearly memos, the shortest shutdown for any given year was from December 23 until January 1.

¶8. The evidence adduced at the hearing before the ALJ revealed that the yearly memo always gave the date that employees were expected to return to work. If the employee failed to return to work on the first day after the scheduled shutdown, the employee forfeited holiday pay. A shutdown for lack of work differed from the Christmas shutdown because, typically, only one maintenance employee and one supervisor worked in order to prevent fires, whereas with the scheduled Christmas shutdown, employees could sign up voluntarily to work specified tasks. MPI experienced a lack-of-work shutdown during the week of Thanksgiving in 2006. The memo sent to employees stated that MPI anticipated some decrease in orders for the remainder of the year but also stated that new programs were expected for 2007.

¶9. Page 20 of the Union Labor Agreement references the shutdown and maintenance cleanup period:

6

1. Employees scheduled or volunteering to work inventories and *vacation shutdowns* will be paid their straight time base hourly rate for the time worked. All shift premiums, crew bonuses, and crew free pay will not be paid for this work. Employees working Maintenance Clean-up during shutdown will receive Maintenance Entry Rate Pay or their regular hourly rate, whichever is the greater.

2. If a Holiday occurs during the plant shutdown, the employee will receive Holiday Pay based on his regular crewing. If an employee works on the Holiday, he will be paid double time for time worked based on the shutdown crewing.

Article V of Labor Agreement (emphasis added). Also, the Labor Agreement states on

pages 22-23:

2. When [any of the company holidays] fall on a Saturday or Sunday, the Company shall, at its option, designate the following Monday or preceding Friday as an observed holiday. When any of the above holidays fall during a *vacation close-down* period the Company shall, at its option, designate a Friday or Monday included in the *vacation close-down period*, as the day to be observed as the holiday for those employees not scheduled to work during the *vacation close-down period*. The day observed as the holiday shall be based upon production requirements as determined by the Company.
. . . .
5. Employees who are laid off in a work week in which a holiday occurs or in a week preceding the week in which a holiday occurs shall be paid for such holiday provided the employee works his last scheduled shift prior to the holiday.

6. Employees returning to work *from lay off* during the week in which the holiday occurs or during the week following the week in which the holiday occurs shall be paid for such holiday provided the employee works his first shift after the holiday.

(Emphasis added). The Labor Agreement also references the Christmas shutdown on page

70:

If the plant is closed for *vacation or Christmas shutdown* or employee is on vacation they (sic) will receive three (3) days funeral pay.

7

(Emphasis added).

¶10. Weston contended that the shutdown was the yearly scheduled occurrence rather than a lack-of-work situation, as MPI had experienced in the past. This was the longest shutdown that MPI had ever scheduled at the holiday season. More employees signed up to work than MPI needed for the work during the shutdown and therefore, employees were chosen by seniority. Approximately thirty employees, plus the maintenance crew, were called to work from the sign-up sheets during the shutdown. However, some of the employees who filed unemployment claims did not even sign up to work voluntarily. MPI filled a typical number of positions during the shutdown.

¶11. Mark Casto, a fifteen-year MPI employee and the recording secretary for the employees' union, also testified at the hearing before the ALJ. According to Casto, he was told that MPI was going to shut down and that employees who wanted to work during that period could sign up for work based on seniority. The procedure was handled as it had been in previous years, but it was the longest holiday shutdown he could recall. Employees who did not sign up would not be able to work, but there was no guarantee that those employees who did sign up would be given work because of seniority limitations. Employees knew that there would be no work available during the shutdown if they did not sign up or were not chosen because they lacked seniority. Casto did not work during the 2006 shutdown because he lacked seniority; however, he stated he would have worked if he had had enough seniority. This was the first year that he had been denied work based on lack of seniority. No employee who worked during the shutdown filed for unemployment benefits; however,

8

some of the claimants did not even sign up for work. Casto had never filed for unemployment benefits during past holiday shutdowns, because over the years, he had been given the opportunity to work based on seniority or had not signed up to work. Casto understood the designated holidays were Christmas Eve, Christmas Day, New Year's Eve, and New Year's Day, which could be observed on Friday or Monday if those days fell on a Saturday or Sunday. Casto could not recall the plant shutting down during the week of Thanksgiving since he had been employed at MPI,[4] and he also could not recall the plant ever shutting down for an entire week due to lack of work.

¶12. Subsequent to the hearing, the ALJ issued an opinion on May 11, 2007, reversing the claims examiner's decision, and holding that the claimants were prima facie unavailable for work because they were on a designated yearly maintenance shutdown as referenced by the Union Labor Agreement. The practical effect of the ALJ's ruling was that MPI was entitled to a non-charge. On July 23, 2007, the MDES Board of Review affirmed the ALJ's decision. On August 3, 2007, Alexander filed a Petition of Appeal in the Circuit Court of Alcorn County.

### PROCEEDINGS IN THE CIRCUIT COURT

¶13. After Alexander's timely filing of a circuit court petition for review pursuant to Mississippi Code Annotated Section 71-5-531 (Rev. 2000), both MPI and MDES filed separate responsive pleadings, and on December 7, 2007, after a review of the administrative

---

[4]Casto's testimony on this point was contradicted by Weston, who had testified that the plant had also closed due to lack of work during the week of Thanksgiving in 2003.

9

record and transcript, the Alcorn County Circuit Court, Judge Paul S. Funderburk presiding, entered an order affirming the decision of the Board of Review. On December 26, 2007, the claimants timely appealed to us.

¶14. There is but one issue for us to consider in today's appeal.

**WHETHER THE CIRCUIT COURT ABUSED ITS DISCRETION IN FINDING THAT THE CLAIMANTS WERE NOT ENTITLED TO UNEMPLOYMENT BENEFITS.**

¶15. Our standard of review in today's case is well-established:

The standard of review for appealing a decision of the MESC is governed by Miss. Code Ann. Section 71-5-531 which provides: "in any judicial proceedings under this section, the findings of the board of review as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of said court shall be confined to questions of law." This Court has previously stated: "where there is the required substantial evidence, this Court has no authority to reverse the circuit court's affirmance of the decision of the Board of Review." *Richardson v. Mississippi Employment Sec. Comm'n*, 593 So. 2d 31, 34 (Miss. 1992) (citing *Ray v. Bivens*, 562 So. 2d 119, 121 (Miss. 1990)); *Piggly Wiggly v. Mississippi Employment Sec. Comm'n*, 465 So. 2d 1062, 1065 (Miss. 1985); *Wheeler v. Arriola*, 408 So. 2d 1381, 1383 (Miss. 1982)). "The board's findings of fact are conclusive if supported by substantial evidence and without fraud." *Hoerner Boxes, Inc. v. Mississippi Employment Sec. Comm'n*, 693 So. 2d 1343, 1347 (Miss. 1997); *See also Richardson*, 593 So. 2d at 34; *Ray v. Bivens*, 562 So. 2d 119, 121 (Miss. 1990); *Melody Manor, Inc. v. McLeod*, 511 So. 2d 1383, 1385 (Miss. 1987). Therefore, "this Court must not reweigh the facts of the case or insert its judgment for that of the agency." *Allen v. Mississippi Employment Sec. Comm'n*, 639 So. 2d 904, 906 (Miss. 1994) (citing *Mississippi Pub. Serv. Comm'n v. Merchants Truck Line, Inc.*, 598 So. 2d 778, 782 (Miss. 1992)).

*Broome v. Miss. Employment Sec. Comm'n*, 921 So. 2d 334, 337 (Miss. 2006).

¶16. First, the claimants argue that the ALJ, the Board of Review, and the circuit court abused their discretion in finding that the plant was not shut down for lack of work during

the week of Thanksgiving and the two-week period which encompassed the Christmas and New Year's holidays. The claimants rely on a notice dated November 7, 2006, which stated in pertinent part: "Business is slower than we expected, even for this time of year and we're struggling to load four Calendars. We have some new programs on the horizon and anticipate being busy the first quarter of 2007. However, we need to do something until then to get us there. Therefore, the best thing to do is to close the plant the week of Thanksgiving and hopefully allow orders to catch up."[5]

¶17. However, the only issue before the ALJ, and therefore the Board of Review and the circuit court, was whether the claimants were unavailable for work during the two-week Christmas shutdown in 2006. In the MDES hearing notice dated April 11, 2007, notifying the parties of the April 24, 2007, hearing before the ALJ, all concerned parties were put on notice that the sole issue to be considered was whether the claimants were "prima facie unavailable for work due to a holiday period or vacation for week(s) ending 12/23/06 [and] 12/30/06." At the commencement of the hearing on April 24, 2007, Judge Gill stated, *inter alia*, that the hearing was "being conducted in order to determine whether or not the claimants involved were able and available for holiday or vacation pay for the weeks in question" and that "[t]he weeks specifically involved for this particular hearing is week

---

[5]The claimants assert that this week off during Thanksgiving provided them with the needed one-week waiting period required pursuant to Mississippi Code Annotated Section 71-5-511(d) (Rev. 2000) to then be eligible to receive unemployment benefits for the entire holiday period encompassing the 2006 Christmas and New Year's holiday season, inasmuch as the shutdown during that period, according to the claimants, was due to lack of work. This claim will be discussed, *infra*.

11

ending December 23, 2006 and December 30, 3006." Finally, in her opinion of May 11, 2007, Judge Gill stated that the sole issue to be considered was "whether or not the claimant is prima facie unavailable for work due to a holiday period or vacation period for week(s) ending December 23, 2006, and December 30, 2006."

¶18. The claimants argue that because the Thanksgiving shutdown notice states that MPI would close for lack of work and that orders would be slow for the remainder of the year, it must be inferred that the plant's Christmas shutdown was the longest in history because there was a lack of work. However, the claimants presented no evidence of this claim. It is clear that MPI had a scheduled shutdown each year, as referenced in the union agreement. It is also clear that, while this shutdown was the longest, the shutdown was similar in time and amount of time to the shutdowns in past years. Therefore, there was no abuse of discretion on the part of the ALJ and the Board of Review in finding that the two-week Christmas shutdown in 2006 was not a lack-of-work shutdown.

¶19. Next, the claimants argue that the ALJ, the Board of Review, and the circuit court abused their discretion "by holding that the reason for the layoff was vacation in one part of the Decision and/or for maintenance in another part of the Decision, when, in fact, the layoff was caused by a lack of work." As discussed *supra*, there was no abuse of discretion in holding that the shutdown was not caused by a lack of work. The claimants further argue that Mississippi Code Annotated Section 71-5-511(d) provides a waiting period of one week before an employee can draw unemployment benefits, but after the one-week waiting period, the employee is entitled to benefits for any full week that work is not available for him.

12

Thus, the claimants argue that the Thanksgiving shutdown for lack of work constituted the first week of unemployment, and that they are entitled to benefits for the two-week shutdown at Christmas. The ALJ, the Board of Review, and the circuit court found otherwise, relying on Mississippi Code Annotated Section 71-5-511(k) (Rev. 2000), which states:

> An individual shall be deemed prima facie unavailable for work, and therefore ineligible to receive benefits, during any period which, with respect to his employment status, is found by the department to be a holiday or vacation period.

¶20. Although factually dissimilar and different in outcome, we find the Court of Appeals' decision in *Mississippi Employment Security Commission v. Funches*, 782 So. 2d 760, (Miss. Ct. App. 2001) beneficial in discussing today's case. In *Funches*, the Court of Appeals stated, *inter alia*:

> In 1998, Funches and others similarly situated were employed as part-time non-seniority employees with Delphi Packard Electric Company in Clinton, Mississippi. An agreement between the local union and the employer provided that Delphi would shut down its operations during Independence week with the option of designating as plant vacation shutdown week the week before or after the Independence week shutdown. The agreement provided that active employees without seniority such as Funches would be on "lay-off" during the shutdown.
>
> . . . .
>
> As stated, Funches and the other appellees here are active employees without seniority. During the shutdown, they applied for and were denied unemployment benefits. The denial was based on the conclusion reached by the Board of Review of the Mississippi Unemployment Commission that Funches and the other appellees were not involuntarily unemployed and were not available for work.
>
> . . . .
>
> The central issue is whether there is substantial evidence to support the decision of the Board of Review that Funches and others similarly situated are not entitled to benefits because of the dictates of Mississippi Code Annotated Section 71-5-511(k) (Rev. 2000) which provides that "[a]n individual shall be

13

deemed prima facie unavailable for work, and therefore ineligible to receive benefits, during any period which, with respect to his employment status, is found by the commission to be a holiday or vacation period."

. . . .

The critical focus must be on whether during the vacation shutdown period, Funches's employment and the employer/employee relationship had already been terminated or whether it had been just temporarily suspended to be resumed after the shutdown. For us, the answer is clear. According to the collective bargaining agreement, Funches was laid off. Based on the already quoted testimony of company employee, Johnson, Funches's employment and the employer/employee relationship had ended. It came to an end prior to the shutdown, not after, because during the shutdown, Funches was removed from Delphi Packard Electric's active employment roll. Nothing in the collective bargaining agreement required the removal of Funches from Delphi Packard Electric's employment roll. While Funches was unavailable for work during what was termed a "vacation shutdown period," it cannot be argued legitimately, on these facts, that Funches was on vacation. For the reasons set forth, we affirm the decision of the circuit judge reversing the decision of the Board of Review denying benefits.

*Id.* at 761-62, 764-65 ¶¶4-7, 18. However, our case today is distinguishable because in *Funches*, the union agreement specifically provided that the employees would be laid off during the shutdown; but here, the union agreement on pages 22-23 clearly distinguishes between vacation shutdowns and layoffs. Additionally, no employees were removed from the employment rolls. Quite the contrary, all employees were expected back at work on January 3, 2007, and the administrative record reveals that all of the employees have continued their employment with MPI.

¶21. The *Funches* court relied on three cases from this Court: *Mississippi Employment Security Commission v. Jackson*, 237 Miss. 897, 116 So. 2d 830 (1960); *Smith v. Mississippi Employment Security Commission*, 344 So. 2d 137 (Miss. 1977); and *Buse v.*

14

*Employment Security Commission*, 377 So. 2d 600 (Miss. 1979).  In *Funches*, the Court of

Appeals stated:

> In *Jackson*, the court framed the issue before it this way: "The question for our
> decision involves the right to unemployment compensation for a period when
> the plant was shut down for vacations in accordance with the union contract."
> *Jackson*, 237 Miss. at 899, 116 So. 2d at 831.
>
> . . . .
>
> These employees filed claims for unemployment benefits with the Mississippi
> State Employment Security Commission for the three week period beginning
> December 13, 1957. The Commission allowed the claims for the first and third
> week but disallowed the claims for the second week of the three week period.
> The basis of the denial of the claims for benefits for Christmas week was that
> the employees were not involuntarily unemployed and were not available for
> work within the meaning of the statute. *Id.* at 898-99, 116 So. 2d at 831. The
> circuit court reversed the Commission, and on appeal, the Mississippi Supreme
> Court reversed the circuit court and reinstated the decision of the Commission,
> with these instructive words:
>
>> The shutdown for Christmas week was in accordance with the
>> union contract and the union represented all of the appellees. It
>> cannot be said that appellees were unemployed within the
>> meaning and purpose of the statute. *They were not laid off; their
>> employment had not been terminated, and the relationship of
>> employer and employee continued during the week the plant was
>> closed* for the purposes stated.
>
> *Jackson*, 237 Miss. at 901, 116 So. 2d at 832. (Emphasis added).

*Funches*, 782 So. 2d at 762-63, ¶¶9-10.  This Court opined in *Jackson* that because the

union agreed to the shutdown and the employees had not been terminated, the claimants were

not entitled to benefits.  Such is the situation in our case today.  The Court of Appeals also

stated:

> In *Smith*, Gloria J. Smith, due to pregnancy, took a leave of absence from her
> position as an accounting clerk at Desoto, Inc. on August 30, 19[7]4. She was
> supposed to return from leave on December 3, 19[7]4. It was company policy

15

to grant a three-month leave of absence for pregnancy without terminating the employment. However, prior to December 3, Mrs. Smith was informed that because of declining business conditions her position had been temporarily eliminated, and she was being "involuntarily" laid off. *Smith*, 344 So. 2d at 139. The employer, the Board of Review and the circuit court concluded that Smith had left work voluntarily and denied her benefits. *Id.* at 138.

On appeal, the Mississippi Supreme Court concluded that Smith was entitled to benefits beginning December 3, 19[7]4, the day she was due to return to work but could not because she had been laid off. *Id.* at 140. While it is clear in *Smith* that Mrs. Smith voluntarily took a leave of absence, it is likewise equally clear that her employment continued during her leave of absence. She simply temporarily suspended it pursuant to an agreement with her employer. *Id.* at 139. She did not seek benefits for the period of time covered by her voluntary leave of absence.

. . . .

Mrs. Smith did not seek benefits for the period of time covered by her voluntary leave of absence. Further, during the period of the leave of absence, the employer/employee relationship continued to exist during the period of the leave of absence.

*Funches*, 782 So. 2d at 764, ¶¶14-16. Unlike Mrs. Smith, the claimants in the case *sub judice* are not entitled to benefits. Mrs. Smith sought benefits for only the time after which she was terminated from her employment and not during her voluntary leave of absence; however, in today's case, the claimants have not been terminated and seek benefits for a period in which the union agreement acknowledged the shutdown of the plant. Finally, the Court of Appeals stated:

*Buse* involved a situation where Fred Buse was laid off on October 30, 1977, from his employment with Pennsylvania Tire & Rubber Company. He began receiving unemployment compensation one week after his last date of employment. On December 19, 1977, pursuant to a collective bargaining agreement, Pennsylvania paid Buse $525.23 for two weeks accumulated vacation pay for the past year. The Mississippi Employment Security Commission thereafter denied Buse unemployment compensation for the two-week period following such vacation payment. *Buse*, 377 So. 2d at 601. The

16

Commission based its denial of benefits on the premise that the vacation payment constituted "wages" and thereby eliminated unemployment benefits for the period. *Id.* Therefore, the issue in *Buse* was whether Buse had earned wages in December or whether the wages were earned prior to discharge. The Mississippi Supreme Court agreed with Buse that the wages had been earned prior to discharge. *Id*. We see little support in Buse in aid of the issues before us.

*Id.* at 764, ¶17. This Court further emphasized in *Buse* that the express terms of the union agreement controlled and that the terms of the union agreement entitled Buse to his pay. *Buse*, 377 So. 2d at 602.

¶22. The claimants in today's case agreed to the shutdown, specifically referred to as a vacation shutdown in the union agreement. The employees were paid for the company holidays specified, but were on **unpaid vacation**, in accordance with Mississippi Code Annotated Section 71-5-511(k) (Rev. 2000), for the remaining days of the shutdown. The employment relationship continued during the shutdown, and according to the record before us, all affected claimants remain employed at MPI to this day.

¶23. We thus find this issue to be without merit.

## CONCLUSION

¶24. For the reasons stated, we affirm the Alcorn County Circuit Court's judgment affirming the Mississippi Department of Employment Security's denial of unemployment benefits to the ninety-eight named employees of Mississippi Polymers.

¶25. **AFFIRMED.**

**SMITH, C.J., WALLER, P.J., DICKINSON AND RANDOLPH, JJ., CONCUR. DIAZ, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY EASLEY, J.; GRAVES, J., JOINS IN PART. LAMAR, J., NOT PARTICIPATING.**

17

**DIAZ, PRESIDING JUSTICE, DISSENTING:**

> "If it was the law they was workin' with, why we could take it. But it ain't the law. They're a-workin' away at our spirits . . . they're workin' away at our decency."

John Steinbeck, *The Grapes of Wrath* 256-57 (Penguin Books 2002) (1939).

¶26.    Today's decision is not what Ronnie Alexander bargained for. Mississippi Polymers' imposition of a 16-day unpaid "holiday" circumvents the collective bargaining agreement, and today's majority ignores the ambiguity of whether Alexander and his co-workers intended to agree to such an involuntary dismissal. The law of this state commands that the Court recognize this ambiguity in the collective bargaining agreement and remand the case for a determination of how the parties intended to define a "holiday." The majority's decision to evade that duty is one from which I must dissent.

¶27.    It is undisputed that, so long as the Board of Review's factual findings are supported by evidence and absent of fraud, the scope of our review may encompass only questions of law. Maj. at ¶ 15 (citing ***Broome v. Miss. Employment. Sec. Comm'n***, 921 So. 2d 334, 337 (Miss. 2006)). But our precedent makes equally clear that the existence, or lack thereof, of a contractual ambiguity presents such a question, ***Tupelo Redevelopment Agency v. Abernathy***, 913 So. 2d 278, 283 (Miss. 2005), unlike the resolution of an ambiguity, which is a question for the finder of fact. ***Harris v. Harris***, 988 So. 2d 376, 378 (Miss. 2008). The term "holiday," as it is defined in the collective bargaining agreement, is an unavoidable ambiguity and lies as the very heart of this case.

¶28.    Although a contract is normally interpreted according to its plain meaning, regardless of the parties' intent, courts will consider the intent of the contractors when their agreement contains an ambiguity – that is, when a term is reasonably susceptible to more than one interpretation. *Dennis v. Searle*, 457 So. 2d 941, 945 (Miss. 1984) (citing *Baylot v. Habeeb*, 245 Miss. 439, 446, 147 So. 2d 490 (1962)). Our general reluctance to overturn agency decisions notwithstanding, this is an inquiry that is made *de novo*, with no deference given to any previous determinations. *See Abernathy*, 913 So. 2d at 283.

¶29.    Mississippi law mandates that unemployment benefits may not be afforded to any worker for any period of time that is "a holiday or vacation period." Miss. Code Ann. § 71-5-511(k) (Rev. 2000). The agreement between Mississippi Polymers and its workers, though, is unavoidably ambiguous as to whether the company's annual, end-of-year shutdown is a "holiday" under the collective bargaining agreement. Undoubtedly, Mississippi Polymers has long made practice of sending its workers home near the end of a year for, among other things, the purpose of conducting maintenance on its equipment. And, just as undoubtedly, the conduct of contracting parties is available as evidence of intent. *Hults v. Tillman*, 480 So. 2d 1134, 1143 (Miss. 1985). But the collective bargaining agreement, by its very terms, lists 12 specific "holidays" and limits each of them to a single day. If this is not indisputable proof that Alexander and his co-workers did not agree to the end-of-year shutdown, then it is at least proof of an inescapable and critical uncertainty in the collective bargaining agreement. The majority's decision to ignore that ambiguity is a mistake – one for which Alexander and his co-workers are left to pay.

19

¶30.    This Court walks a fine line in its reviews of labor decisions. Our reviews in matters such as this must be limited, but they must not be so passive as to deprive the laborers of this state of the day in court to which they are entitled. The relationship between worker and employer is one that is inherently unfair. And for all the important roles in our society played by corporations, they are economic behemoths of immense power, for which workers are all too often no match. *See Am. Steel Foundries v. Tri-City Trades Council*, 257 U.S. 184 (1921).

¶31.    Our labor laws, by the wisdom of our legislators and the grace of God, have developed to shield workers from that oppressive power. But when a court of last resort such as this abdicates its duty to enforce labor laws fairly, workers like Ronnie Alexander are left naked to struggle alone against a jailer holding the keys to economic oppression. Neither that fight, nor today's decision, is a fair one. Therefore, I dissent.

**EASLEY, J., JOINS THIS OPINION.  GRAVES, J., JOINS THIS OPINION IN PART.**